Richard N. CAMPBELL, Appellant (Defendant below),

v.

STATE of Wyoming, Appellee (Plaintiff below).

No. 4820.

Supreme Court of Wyoming.

Jan. 15, 1979.

Frank R. Chapman, Public Defender for Laramie County, and W. Michael Kleppinger, Wyoming Defender Aid Program, Casper, signed the brief and Mr. Kleppinger appeared in oral argument on behalf of appellant.

V. Frank Mendicino, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., and Allen C. Johnson, Asst. Atty. Gen., signed the brief for appellee. Mr. Johnson appeared in oral argument on behalf of the appellee.

Before RAPER, C. J., and GUTHRIE,* McCLINTOCK, THOMAS and ROSE, JJ.

RAPER, Chief Justice.

The defendant-appellant was charged with aggravated robbery in violation of § 6–66, W.S. 1957,[1] (§ 6–4–402, W.S. 1977), found guilty by a jury and sentenced to a penitentiary term of not less than eight nor more than fifteen years. On appeal, defendant defines the issues to be:

"1. Whether the Trial Court's refusal to suppress the in-court identification of the Defendant as the perpetrator of the robbery by the victim deprived the Appellant of due process of law.

"2. Whether the Trial Court committed plain error in refusing to instruct the jury as to its consideration of identification testimony."

We will affirm.

Early in the morning hours, Woody's Truck Stop was robbed. The testimony was that after the robber had left Woody's

Truck Stop, the victim-attendant, Hughes, got on the company C.B. and called for help. The call was received at the police station and an alert went out to patrolling officers. Officer Brent drove to Woody's Truck Stop where the attendant pointed in the direction of 5th and Morrie. According to Brent, he took off immediately without stopping to interview the attendant.[2] On the way to 5th and Morrie, not far away, he broadcasted by radio his destination to two other patrol cars, both of which converged on the vicinity. Officer Brent testified that while he was approaching the area, two or three blocks away, he saw a vehicle leave the curb at high speed, so took off in pursuit. Though there is no testimony that any witness saw the defendant exit the vehicle, the circumstances indicate that he did so because Officer Markland spotted him in flight in the area, chased after and apprehended him.

In the meantime, Officer Kolkman came up to assist. Officer Brent then went back to talk to the attendant where he was interviewed. Brent took into evidence a white paper sack. Other officers appeared to make a crime scene investigation. Brent took Hughes to the police station to take a statement.

Markland, the officer while engaged in the chase, saw the defendant take off a green jacket and throw it on the ground. He assisted in the search of the defendant for weapons. He identified the defendant

---

* At the time of oral argument, while this case was under advisement and at the time a decision was reached, Guthrie, J., was Chief Justice. He retired from the court on December 31, 1978. By order of the court, entered on January 1, 1979, he has been retained in active judicial service pursuant to § 5, Art. V, Wyoming Constitution and § 5–1–106(f), W.S. 1977. Rooney, J., did not participate.

1. Section 6–66, W.S. 1957 (§ 6–4–402, W.S. 1977):

"Whoever forcibly and feloniously takes from the person or possession of another any property of value, by violence or by putting in fear, when a firearm or other deadly weapon is used or exhibited in the commission of the offense, is guilty of aggravated robbery and shall be imprisoned in the penitentiary

for not less than five years nor more than fifty years."

2. It does not appear that Brent was thoroughly interrogated at the trial as to just what, if any, identification was given him by Hughes before undertaking pursuit. Hughes, in his testimony however, stated on cross-examination that he gave the officer the following description:

"A. Well, about five foot seven, five foot eight, right around 140 to 150 pounds, had a green jacket on and had a hat.

"Q. What about hair?

"A. Had long stringy hair, too.

"Q. Did you tell them anything about a mustache?

"A. No, because they didn't ask too much. I just pointed that way and they took off."

in the courtroom as the person apprehended and, during the course of that identification, noted that the defendant, at the time of trial, was attired in a wine colored leisure suit and had a mustache. He recovered the green jacket and searched the vehicle. He observed a quantity of paper currency blowing around in the wind and a black wig laying on the ground. In the vehicle, on the seat, was a pistol along with more loose currency. The total amount of currency recovered was $403.00. Later on, an additional $30.00 was taken from the defendant's person.

Kolkman, one of the three pursuing officers, identified defendant as wearing a T-shirt, dark pants, medium length hair and having a mustache at the time of apprehension. His testimony was that the defendant was apprehended about three blocks north of Woody's. He testified that the money blowing around was picked up. He also testified that he saw a black and gray checkered hat on the floor of the vehicle and the wig. A fourth officer investigated the crime scene, Woody's Truck Stop, where he found a bullet hole in a wooden counter shelf and assisted in prying out the bullet.

A fifth officer testified that he picked up a .22 caliber short cartridge case from the floor of the truck stop. The State's chief forensic scientist and director of the crime laboratory positively identified the cartridge case by use of a comparison scope, matching its firing pin marks with those on the cases of cartridges test-fired from the pistol recovered by Officer Markland from the vehicle. He could not identify the bullet other than saying that it was also .22 caliber, but pointed out it was too badly battered to identify as being a bullet fired from the recovered firearm.

The filling station attendant, Hughes, was the last witness to testify for the State. In the courtroom he identified the defendant as being the one who had held him up at Woody's Truck Stop by pointing a pistol in his face. He particularly recalled what the defendant was wearing. He testified further that the robber was carrying a white paper bag and directed Hughes to hand over all of the money from the cash register—a quantity of paper currency—which Hughes did, after which the defendant told Hughes to lay on the floor. After the robbery, he made an "inventory" and found there to be $403.00 missing. He testified that, before departing, the robber shot off the pistol a foot or so over the top of his head and took off. After lying there for a few minutes, he got on the company's C.B. and called for help. Hughes testified that, at the time of the robbery, the defendant had a mustache was wearing a green coat, had long stringy hair (the wig) and was wearing a dark hat. When handed the green jacket in the courtroom, he recalled the dark spot on the shoulder. The defendant was asked to stand. Hughes said the robber was the same height and weight.

At the preliminary hearing, in the presence of Hughes, the defendant was escorted into the courtroom of the Justice of the Peace in jail clothing and handcuffed. Defendant objected to his attire. The interrogation of Hughes by the county attorney got hardly past its introductory stage. He had described his duties at Woody's Truck Stop as night attendant. A few minutes before 2:00 a. m., a "guy" came through the door, raised up a gun, put a sack on the counter and said "hand it over". He was wearing dark colored headgear, like a skullcap, had long-black-stringy hair, was wearing a rain jacket, had dark pants and had a mustache. He was asked if he "might" recognize the person if he saw him again. Hughes answered "yes". Counsel then queried: "Mr. Hughes, from your independent recollection and trying to recall what happened that evening, would you say the Defendant was that person? After some interchange between counsel and further questions, Hughes answered "yes, he's in the room; he's sitting by his attorney." That is as far as the preliminary progressed when it was aborted by the Justice of the Peace. At that point, the presiding Justice of the Peace became indignant over defendant's manner of dress for the occasion, suspended the hearing as a "farce" and disqualified himself from participation in any further preliminary procedures. The pre-

liminary hearing was later reconvened before another Justice of the Peace, at which the defendant was bound over to the district court. No transcript of testimony received at the last preliminary hearing appears in the record.

Before commencement of trial, the defendant moved to suppress any in-court identification of defendant by Hughes on the ground that the circumstances of defendant's appearance at the first preliminary hearing so tainted identification by Hughes that defendant was denied due process. The trial judge denied the motion. The defendant relies strongly on statements made in *Frasier v. State,* 1974, 262 Ind. 59, 312 N.E.2d 77, cert. den. 419 U.S. 1092, 95 S.Ct. 686, 42 L.Ed.2d 686, and *Estelle v. Williams,* 1976, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126. We have no disagreement with either case.

In *Frasier* the court relied upon *Stovall v. Denno,* 1967, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, which recognized a rule already in existence that the inquiry is "whether * * * the confrontation * * was so unnecessarily suggestive and conducive to irreparable mistaken identification that he [the defendant] was denied of due process of law." 388 U.S. at 301–302, 87 S.Ct. at 1972, 18 L.Ed.2d at 1206. (Bracketed material supplied.)[3] The *Frasier* court concluded the test to be whether the witness was, in fact, influenced by the totality of the circumstances in a manner indicating a very substantial likelihood of misidentification. The case held on the facts before it there to be no substantial likelihood of misidentification. We agree with the "totality" test and find it applicable but not with the same result urged by defendant.

*Estelle* deals only with the problem of the appearance of a defendant in prison garb *at a jury trial* and not with his appearance at a preliminary hearing. Nor does *Estelle* hold that it is inherently error for a defendant to wear prison garb during trial. The case does not concern identification and holds only that, in the absence of objection, the fact that defendant appeared in identifiable prison clothing was not error. We do not disagree with the principles of *Estelle* but find them inapplicable to the case before us, in that we are concerned with a preliminary hearing and an identification issue.

Following the *Gilbert-Wade-Stovall* triad in *Simmons v. United States,* 1968, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247; *Foster v. California,* 1969, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402; *Coleman v. Alabama,* 1970, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387; *Neil v. Biggers,* 1972, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401; and *Manson v. Brathwaite,* 1977, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140, in that order, the Supreme Court has struggled with the scope of due process protection against the admission of evidence derived from suggestive identification procedures.

In this court, the issue of unnecessarily suggestive pretrial identification has not been met head on. The matter has only been touched at its fringes. While not clearly delineated, this court in *Fresquez v. State,* Wyo.1971, 492 P.2d 197, indicates its acceptance of the rule that the court will look at the totality of the circumstances surrounding a pretrial confrontation that is suggestive or conducive to mistaken identification. The Court had before it *Simmons v. United States,* supra and *Stovall v. Den-*

---

**3.** *Stovall v. Denno* is one of three cases which involved trial lineups for identification purposes. The other two were *United States v. Wade,* 1967, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 and *Gilbert v. California,* 1967, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, in both of which the Court held the lineups under consideration to be constitutionally infirm and in violation of the accused's Sixth Amendment guarantee to have the assistance of counsel for his defense. In each was a past indictment lineup conducted in the absence of counsel. One function of *Stovall* was to hold that the presence of counsel rule in the trilogy of cases was not to be applied retroactively. It also confirmed, on already recognized grounds of attack, that a claim of unnecessarily suggestive identification conducive to irreparable mistaken identification is independent of any right-to-counsel claim and depends upon the totality of circumstances surrounding it. 388 U.S. at 302, 87 S.Ct. at 1972. *Stovall* did not find the confrontation there offensive, in the absence of counsel.

*no,* supra. It did not, however, consider an accidental meeting between a rape victim and the defendant-assailant at the police station, in looking at the totality of the circumstances, as a suggestive confrontation conducive to mistaken identification, particularly since that objection was not raised at the trial.

There are not many cases involving preliminary hearing, pretrial identification. In *State v. Strickland,* 1976, 113 Ariz. 445, 556 P.2d 320, the defendant was first identified by the victim of a robbery at a preliminary hearing after having failed twice to identify him at two "live" lineups or at a photo lineup, and had, in fact, singled out another individual altogether at a live lineup. Her (the victim's) opportunity to see the defendant was before the incident when, with two others, he walked past while she had no interest in observing the individual characteristics of each. She was grabbed from behind and a money pouch taken from her. In the struggle, she lost her glasses and could not see the attacker afterwards. At the preliminary hearing, the defendant wore a county jail T-shirt and was seated alone with counsel at the defense table. She then found she could identify the defendant with certainty. She had been informed that the defendant had confessed. In the *Strickland* case, the Arizona Supreme Court found there was "very substantial likelihood of irreparable misidentification," citing *Simmons v. United States,* supra at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1247, and reversed the conviction even though defendant had confessed to the crime. The court went on to hold that it could not say that the witness' "positive identification was harmless and did not contribute to the verdict." At the same time, the court did not proscribe identification made for the first time at preliminary hearings and emphasized that the suggestibility of preliminary hearings does not per se taint the subsequent in-court identification, citing *State v. Williams,* 1976, 113 Ariz. 14, 545 P.2d 938, where the pretrial identification was of a man manacled to a police officer (not at a preliminary hearing). We conclude that case to be one which must be isolated on its unique facts. Its principal value is a demonstration of the extreme circumstances that must exist to suppress identification testimony at a preliminary hearing.

On the other hand, in the bank robbery case of *United States v. Black,* 6th Cir. 1969, 412 F.2d 687, F.B.I. agents took two witnesses from Tennessee to a Chicago courtroom during the hearing of a pretrial motion at which the defendant, not in prison garb, was present. At the request of the district attorney yet another witness was taken to observe a pretrial motion hearing at which the defendant was again present. The court held there was no violation of due process and acknowledged that whether due process had been violated depended upon the totality of the circumstances, citing *Simmons v. United States,* supra. See also to the same effect, *United States v. Lipowitz,* 3rd Cir. 1968, 401 F.2d 591, where witnesses were requested to sit in the courtroom during arraignment. There was held to be no due process violation.

In *United States ex rel. Springle v. Follette,* 2nd Cir. 1970, 435 F.2d 1380, cert. den. sub nom. *Springle v. Zelker,* 401 U.S. 980, 91 S.Ct. 1214, 28 L.Ed.2d 331, it was said that a totality of circumstances necessarily means that the entire trial must be scrutinized to see whether on balance the petitioner received a fair hearing. *Clemons v. United States,* 1968, 133 U.S.App.D.C. 27, 408 F.2d 1230, cert. den. 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567, involved a preliminary hearing identification by witnesses but not under the circumstances before us (no jail garb or handcuffs). The concurring opinion of Circuit Judge Leventhal expressed the view that the Court must assess not only the totality of circumstances surrounding a particular identification but also the totality of trial proof bearing on the likelihood of misidentification. The approach would in effect create an overlap with the harmless error rule. The Supreme Court in *Wade,* supra (footnote 3), 388 U.S. at 242, 87 S.Ct. at 1940, remanded for a determination of "whether the in-court identifications had an independent source, or whether, in any

event, the introduction of the evidence was harmless error * * *."

The federal cases cited in the preceding two paragraphs, as do many other cases, ▮▮▮ West's Digest System, place some significance on whether the questioned pretrial identification took place before or after *Stovall v. Denno,* supra, even though it was specifically stated in *Stovall* that a claim of unnecessarily suggestive identification conducive to irreparable mistaken identification was an already recognized rule. (See our footnote 3). In *Manson v. Brathwaite,* supra, as we view it, an effort was made to clear up various misconceptions and questions that had arisen from *Stovall,* supra; *Neil v. Biggers,* supra; *Simmons v. United States,* supra; *Foster v. California,* supra; and *Coleman v. Alabama,* supra, with respect to the relationship between suggestiveness and misidentification. The Court in *Manson* said:

> "We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony for both pre- and [post]-*Stovall* confrontations. * * *" 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154.

While it is difficult to do so, we conclude that the *Manson* Court separates the reliability of the identification from other evidence of guilt. Justice Blackmun in the Court's opinion:

> "Although it plays no part in our analysis, all this assurance as to the reliability of the identification is hardly undermined by the facts that respondent was arrested in the very apartment where the sale had taken place, and that he acknowledged his frequent visits to that apartment." (Footnote omitted.)

Then Justice Stevens in his concurring opinion:

> "Second, in evaluating the admissibility of particular identification testimony it is sometimes difficult to put other evidence

of guilt entirely to one side.* Mr. Justice BLACKMUN'S opinion for the Court carefully avoids this pitfall and correctly relies only on appropriate indicia of the reliability of the identification itself. * * *"4  432 U.S. at 118, 97 S.Ct. 2254-55, 53 L.Ed.2d at 156.

▮ We therefore divide a consideration of the problem into two phases: First, the court must consider whether upon a totality of the circumstances, there is a very substantial likelihood of irreparable misidentification, and, if so, to secondly consider harmless error. In the first phase, *Manson* discards a per se approach which focuses on procedures and requires exclusion of out-of-court identification whenever obtained through unnecessarily suggestive confrontation procedures without regard to reliability. The defendant in the case now before us urges this course. The *Manson*-approved approach relies upon the totality of circumstances but permits the admission of pretrial identification evidence, if despite the suggestive aspect, it possesses features of reliability. It is an ad hoc course which permits relevant evidence for consideration and evaluation by the fact trier, the underlying factor being that of fairness. Justice Blackmun, writing for the Court, spoke approvingly of language used by Judge Leventhal in his concurring opinion in *Clemons v. United States,* supra:

> " 'It is part of our adversary system that we accept at trial much evidence that has strong elements of untrustworthiness—an obvious example being the testimony of witnesses with a bias. While identification testimony is significant evidence, such testimony is still only evidence, and, unlike the presence of counsel, is not a factor that goes to the very heart—the "integrity"—of the adversary process.
>
> " 'Counsel can both cross-examine the identification witnesses and argue in

4.  The footnote * in pertinent part:
   " * * *  These facts should not, however, be considered to support the admissibility of eyewitness testimony when applying the criteria identified in *[Neil v.] Biggers* [409 U.S. 188, 34 L.Ed.2d 401, 93 S.Ct. 375]. Properly analyzed, however, such facts would be relevant to a question whether error, if any, in admitting identification testimony was harmless." (Bracketed material supplied.)

summation as to factors causing doubts as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi.'" Fn. 14, 432 U.S. 113, 97 S.Ct. 2252–53, 53 L.Ed.2d 153.

■ The *Manson* Court would then, against a test of reliability, employ the factors to be considered, set out in *Neil v. Biggers,* supra. As expressed in *Manson* : "* * * These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154.

We use the *Manson* version because of the last sentence which did not appear in *Neil v. Biggers,* supra, because it gives us a guide to what to do with the factors after we ferret them out.

Applying those factors, then, we see that Hughes had an adequate opportunity to view the defendant, perhaps a minute and a half or so. He was no casual observer but the victim of the unforgettable and dangerous experience of being confronted by an individual armed with a formidable appearing weapon. When Hughes was told to "hand it over," he had further opportunity to observe the defendant while he proceeded to the cash register, removed the money and placed it on the counter for defendant to pick up. After that, Hughes was required to lay on the floor. It appears reasonable to believe in that time and under those conditions, the defendant's facial features could well be placed on record within the witness' memory. Although defendant wore a wig, he had no mask. The opportunity to observe was present.

There is no question but that the defendant had Hughes' attention with a handgun leveled at him. Hughes was in such a position that he had better pay attention: "I noticed that he was a nervous type person, and he began moving a little bit, so I did what he said real quick."

With respect to the factor of the accuracy of his prior description of the criminal, the prior description given by Hughes, upon which defendant relies, was the one given at the miscarried preliminary hearing. The testimony of Hughes at the trial though was that he had previously described the defendant to arresting officers as related in footnote 2 of this opinion. At the preliminary hearing he recollected that the defendant had a mustache and was present at the preliminary hearing and the trial. The significant parts of the description at the scene and preliminary hearing had to do with his clothing, the stringy hair, the headgear and the weapon he carried. There was no suggestive identification at the preliminary hearing that would bring those matters of identification to the attention of Hughes. At the preliminary hearing the defendant was not in the same dress, wearing a hat, carrying a pistol, or adorned with a wig. There were some insignificant variations between the description of those items at the preliminary and the trial but exactness would surely create suspicion. Borrowing the approach of the Court in *Manson,* in recognition that it plays no part in our analysis at this point, the reliability of the identification of the defendant's appearance at the time of the crime is hardly undermined by the corroboration found in the other evidence of defendant's dress and other accouterments related to him at the time of arrest.

The level of certainty demonstrated at the confrontation was adequate. The testimony at the terminated preliminary hearing indicated no uncertainty. Through no fault of the State or the witness, no opportunity was afforded to test the witness' certainty through cross examination. No showing whatsoever was made that, in light of the factors just discussed, the suggestive identification in any way corrupted the testimony of the witness Hughes. While other evidence of guilt cannot be considered at

this stage, we can consider the role of this particular witness as far as identification is concerned. The prosecutor attempted in every reasonable way he could to persuade the Justice of the Peace to hear the rest of the evidence, not only further testimony of Hughes but that of other witnesses:

"BAYLESS: I think, Your Honor, if you'll wait and listen to the evidence you'll find that there's alot of independent basis for the identification and so I think the Court's observations are premature and I think that the Court should listen to the balance of the evidence."

There is no indication that the State was attempting in any way to influence the testimony of Hughes.

■ The pretrial confrontation in this case was a necessary proceeding. A fundamental part of a preliminary hearing, as well as a trial, is the presence of the defendant. Regardless of his attire, he can usually be identified by virtue of his role as the person charged. While we do not want to be understood as approving his appearance at a preliminary hearing unnecessarily attired in jail garb and handcuffed over his express objection, the necessity for identification evidence of some sort at that stage is inevitable. The function of the preliminary hearing is to ascertain whether there is "probable cause to believe that an offense has been committed and that the defendant has committed it * * *." Rule 7(b), W.R.Cr.P. There must be identification of some sort to relate the defendant to the crime. It is not always through eye-witnesses.

There never was any identification of the defendant other than in a courtroom. This is not the usual suggestive identification utilized to track down and arrest a violator. There is not involved a photographic lineup, a police lineup, a police station identification, an on-the-scene showup, or any other outside device to show the defendant to the witness for identification purposes. Except for his crime scene observation of the defendant, Hughes had not been afforded any opportunity until the preliminary hearing to make any identification. The objections of the defendant, followed by the abrupt outburst of the Justice and his inappropriately piqued withdrawal from the proceeding gave the State no fair opportunity at that juncture to further demonstrate the reliability of Hughes' identification nor was the defendant afforded an opportunity to establish the unreliability of the identification. Hughes' recollection of the defendant as seen when he was being held up with a gun in his face stands unchallenged. *Manson* makes it clear that a suggestive confrontation does not per se command the exclusion of the identification testimony. Further, in *Manson*, reversal is considered a "draconian sanction," for cases in which the identification is reliable despite an unnecessarily suggestive procedure:

" * * * Certainly, inflexible rules of exclusion, that may frustrate rather than promote justice, have not been viewed recently by this Court with unlimited enthusiasm. [citing cases.]" 432 U.S. at 113, 97 S.Ct. at 2252, 53 L.Ed.2d at 153.

■ The Court in *Manson* confirmed *Neil v. Biggers,* supra, on the question of unnecessarily suggestive identification where it elaborated upon the totality of circumstances test:

" * * * It is, first of all, apparent that the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.' * * * " 409 U.S. 188, 93 S.Ct. 375, 381, 34 L.Ed.2d 401, 410.

From our review of the totality of the circumstances of the pretrial identification, we cannot say that there was a "very substantial likelihood of irreparable misidentification." The burden on the defendant is not an easy one. The weight to be given to the Hughes' identification was for the jury and not the trial court nor this court. In our judicial capacity, we must discriminate between real and fancied dangers of the miscarriage of justice.

■ Even assuming that there was constitutional error in the type of pretrial identification here and that it did taint the testimony of the witness Hughes, we need not accept the view of the defendant that regardless of the facts and circumstances it

must be deemed plain error requiring an automatic reversal. Rule 49, W.R.Cr.P.[5] Before a federal constitutional error can be held harmless, the burden is on the State to demonstrate and the court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Chapman v. State of California,* 1967, 386 U.S. 18, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065. There are but few constitutional violations so basic that infraction can never be classed as harmless error.[6] We cannot find that the Supreme Court of the United States has held that the substantial likelihood of misidentification is justification in itself to declare plain error. As previously indicated, in *United States v. Wade,* supra, the Court recognized harmless error to be available. *Foster v. California,* supra, was remanded for a determination of whether there was harmless error. We turn now to applying that standard, and will conclude there can be no doubt that any error, if it existed at all, was harmless.

█ The courtroom identification of the defendant at the preliminary hearing has little significance. The defendant was not wearing the same clothing that he was wearing at the time Woody's Truck Stop was robbed. He was not wearing the same kind of clothing at the time of robbery that he was wearing in the courtroom at the time of the trial. He was convicted because of the vast circumstantial evidence against him. What is significant is Hughes' description of what he saw at the scene of the crime which was nothing like what he saw at the preliminary hearing or the trial. He described an individual in a green coat, dark pants, with a long-stringy-hair wig, wearing dark headgear and pointing a pistol at him. A policeman came, and apparently at that time Hughes did little more than state the robber was heading off in a northerly

direction. See footnote 2. The individual that was apprehended had in his possession a pistol, money in the same amount as stolen, a wig, was wearing a green coat, and was apprehended in flight, all as a result of whatever it was that the station attendant told the policeman before the policeman wasted no time getting out after the criminal. Moreover, Hughes' testimony was substantiated by other independent evidence, e. g., a cartridge case was found on the floor of the truck stop which matched the weapon taken from the defendant. The defendant showing up in prison garb and handcuffed at a preliminary hearing could not corrupt all that decisive evidence. Identification can be established by circumstantial evidence which then becomes a jury question. *Johnson v. State,* Wyo.1977, 562 P.2d 1294.

█ After we have examined the total circumstances to determine if there was an unduly prejudicial pretrial identification, upon an evaluation of the totality of surrounding circumstances, we then examine the facts for harmless error. What was the effect of all the evidence identifying the defendant as the person who robbed Woody's Truck Stop? Reason indicates that there must be a causal connection between a " 'substantial likelihood of irreparable misidentification,' " *Neil v. Biggers,* supra, and the guilty verdict as viewed against the totality of the circumstances, *Simmons v. United States,* supra. When Hughes' description is coupled with the sequence of events leading to the capture of defendant, the articles found in the car from which the circumstances and inferences point to his having exited, there can be no doubt of guilt. The witness Hughes could have been less than positive and even doubtful whether the defendant seated at defense table

---

5. Rule 49, W.R.Cr.P.:

"(a) Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

"(b) Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

Same as Rule 52, F.R.Cr.P.

6. For example *Payne v. State of Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (coerced confession); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733 (right to counsel); *Tumey v. State of Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749, 50 A.L.R. 1243 (impartial judge).

was the robber, and still the defendant's guilt role in the robbery would lie outside the perimeter of reasonable doubt. The view we take of identification testimony in this case can be summed up as set out in *Johnson v. State,* supra:

" * * * Identification of an accused, therefore, need not be positive in order to obtain a conviction. The witness need only testify that it is his belief, opinion or judgment that the accused committed the crime. The lack of positiveness goes only to the weight of his testimony. [Citations omitted.]

"The general rule with regard to establishing an accused's identity is stated in 77 C.J.S. Robbery § 47, p. 508:

' * * * Where the sum total of circumstantial evidence is sufficient, accused may be identified by his voice, or particular manner of talking, or by tracks, or footprints, or *by any distinctive features of his person or apparel, or by any other evidence of a purely circumstantial character.* * * * ' "
(Emphasis in original.)

Through good police work, good fortune, or a combination, the criminal suspect here was apprehended in such close proximity to the time and place of the crime that the speedy interconnection of events quickly puts together the combination of events making identification of the defendant conclusive.

■ This court has many times ruled on the question of prejudicial error in criminal cases, ■ Criminal Law, West's Wyoming Digest, but it does not seem to have set up any standard for the determination of when there is harmless or prejudicial error. For constitutional questions, we adopt the rule of Chapman, whether under the Constitution of the United States or the Constitution of the State of Wyoming. Other than on constitutional questions, error in the admission of evidence is harmless if the facts shown by that evidence are already before the jury through other properly admitted evidence. 3 Wright, Federal Practice and Procedure: Criminal, § 854, p. 361; *Guffey v. United States,* 10th Cir. 1962, 310 F.2d 753.

■ Defendant claims error in failure of the trial court to instruct the jury on identification testimony. The defendant failed to object to refusal of the trial judge to give the offered instruction; we will not consider it on review, *Raigosa v. State,* Wyo. 1977, 562 P.2d 1009, unless it can be brought under the plain error doctrine, which we will not exercise except in exceptional circumstances, *Hampton v. State,* Wyo.1977, 558 P.2d 504. Only recently this court has confirmed its position that a request for an instruction without a distinct objection to failure of the court to so instruct, is insufficient to allow this court's review of the alleged error. *Montez v. State,* Wyo.1977, 573 P.2d 34.

■ The burden is on the defendant to show plain error. *Belondon v. City of Casper,* Wyo.1969, 456 P.2d 238, cert. den. 398 U.S. 927, 90 S.Ct. 1815, 26 L.Ed.2d 89. Defendant fails to show that other instructions given by the court are inadequate to present the factual question of identification for the decision of the jury. The offered identification instructions would have admonished the jurors to use great caution in considering identification testimony, that such testimony was uncertain and less to be relied on than other types. Under the refused instructions, in appraising such testimony, the jury would have been instructed to consider opportunity to observe the offender, whether it was the product of his own recollection, the influence of subsequent identification opportunities, or confrontations between the witness and the defendant. They provided, as well, that the burden of proof on the prosecutor to prove the crime beyond a reasonable doubt specifically includes the identity of the defendant and presence of bias and prejudice resulting from previous confrontations.

■ The trial judge gave complete instructions including directions that the jury was the sole judge of the credibility of the witnesses and weight to be given their testimony, to consider the means of knowledge of facts testified to, the reasonable-

ness of testimony, whether contradicted, any prejudice shown by the evidence, and to consider all the facts and circumstances in the case. The court, through several instructions, admonished the jury as to the duty of the State to prove beyond a reasonable doubt that the defendant committed the crime charged. It is not error to refuse requested instructions which are otherwise covered by other instructions, even though the principles embodied are correct. *Benson v. State*, Wyo.1977, 571 P.2d 595.

Affirmed.

McCLINTOCK, Justice, dissenting.

I believe that the majority has basically cited the pertinent authorities. I differ in the application of the principles there set forth to the facts of this case. In my opinion the identification of defendant as the robber of Woody's Truck Stop was so impermissibly suggestive and of such importance to the prosecution's case that the witness should not have been permitted to give this testimony. To me, there has been a denial of due process which under established principles and the special facts of this case could have affected the outcome thereof. I would therefore reverse and remand the cause for new trial.

At a preliminary hearing held November 18 before Justice of the Peace Garfield, the defense had requested civilian clothing for Campbell but was refused. He was brought into the hearing room by a member of the county sheriff's force, in prison garb and handcuffed. He was the only person in the room thus attired and over objection of counsel that any in-court identification would be tainted and inherently unreliable, was identified by Hughes as the robber. The objection was renewed and Garfield then suspended the hearing, disqualifying himself from further involvement, and describing the procedure as a "farce," and "mockery of justice," by reason of the conduct toward the defendant.

The defendant frames the constitutional issue as a denial of due process of law in that his compelled presence at the preliminary hearing of November 18, 1976, while handcuffed and in prison clothing while the victim of the crime was attending, tainted the victim's identification testimony so that the trial court was required to suppress and exclude such testimony. Failure to do so by that court after timely motion and further objection at the trial is alleged to be error of such constitutional magnitude as compels reversal.

Although this court has had occasion in the past to discuss the issue of identity as an essential element of proof of the offense charged, we have as yet not addressed this issue as presented. I feel this no hindrance, as the United States Supreme Court has spoken on this subject with force. That court has established sufficient standards to cover the issue in a line of cases beginning with *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) and *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). This trilogy of *Wade-Gilbert-Stovall* has spawned other cases which, considered as a continuum, provide a framework upon which to weave an answer.

It is true that *Wade* and *Gilbert* involved the right to counsel at post-indictment lineups, but together with Stovall, they provide a test to determine if a pretrial identification violates due process because it is unnecessarily or impermissibly suggestive. I quote from *Wade*, 388 U.S. at 228, 87 S.Ct. at 1933:

" * * * [T]he confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. * * * A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses

for pretrial identification." (Footnotes omitted)

The determination of a claimed violation of due process of law in the conduct of a confrontation depends on the "totality of the circumstances surrounding it. . ." *Stovall v. Denno*, supra, 388 U.S. at 302, 87 S.Ct. at 1972; whether the subsequent in-court identification should be excluded, as tainted by these pretrial confrontations, will depend on whether or not the latter testimony had an "independent origin." *Gilbert v. California*, supra, 388 U.S. at 272, 87 S.Ct. 1951. The identification will be excluded or its admission determined error, if the "procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). I see the test as follows:

1. The court must determine whether the initial identification, here at the preliminary hearing of November 18, 1976, was so "unnecessarily" or "impermissibly suggestive," that it would "give rise to a very substantial likelihood of irrevocable misidentification."

I would hold that the mere presence of the defendant *in prison clothes and handcuffed*, at a preliminary hearing, where one of the purposes is the identification of the alleged robber by the victim, is inherently, unnecessarily and impermissibly suggestive. This effect has been noted in *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), where the court, citing *Stovall*, supra, noted that "show ups," the practice, in essence, of a one-person lineup, are suspect and widely condemned. I feel it logical that the next step is also true: that a one-person show up, where that person is handcuffed, accompanied by a policeman, and dressed in prison garb is, and must be, inherently suspect. Justice of the Peace Garfield noted as much at the preliminary hearing on November 18, 1976, when he remarked that the witness would naturally identify the person in such a situation. Garfield then continued the hearing and removed himself from further participation.

The Federal Supreme Court has allowed such procedures only in exigent circumstances, as in *Stovall*, supra, where the victim, and only witness, was hospitalized in serious condition. It was a situation where it was imperative that the defendant be shown to the victim immediately before the possibility of death precluded any identification.

Having made this determination, I move to what I feel is the next question:

2. Whether, considering the "totality of the circumstances," and notwithstanding this initial taint, the in-court identification had sufficient "independent basis" or "origin" that the taint was attenuated, or dissipated, sufficiently to find it passes constitutional muster.

In *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), when faced with an identity issue, the court noted that the question that needed to be answered was whether, notwithstanding this suggestiveness, the identification was reliable. In this regard, Biggers presented several factors that should be considered, and listed them as follows: the opportunity of the witness to view the criminal at the crime; the witness' degree of attention; the accuracy of prior descriptions; the level of certainty of witnesses at the confrontation; and the length of time between the crime and the confrontation. 409 U.S. at 199, 93 S.Ct. 375. I proceed to this analysis.

A. Opportunity to view.

There was no testimony as to the lighting condition in or around the truck stop, other than the statement made by Mr. Hughes that it was "dark" when the robbery occurred. This was around 2:00 a. m.

The victim initially claimed that he did not see the alleged robber come in—he heard him. When requested to "hand it over," he stated he acted "real quick" and then upon request laid on the floor. He never saw the robber leave; he only heard him go. He testified the time lapse was one to one and one-half minutes from the initial entry until he laid down. This contradicts, I feel, his statement that he acted

quickly. Later he reduced the time to one minute. He never saw an automobile; he stated he was "afraid," but calm enough to know the robber and what he wore. He testified he was looking out the window and saw the robber approach, less than one block away. He later backed off this testimony, and claimed he did not see him walk up, except for a very short distance, and could not tell if he arrived on foot or by car. In response to the question if he did see him approach on foot, he replied, "No, sir. Yes." His opportunity to view the robber was only fair.

## B. Degree of attention.

It is difficult to chronicle this factor. The victim testified that he noticed the robber was a "nervous type person." He was certain of the jacket ("green") although he had earlier described it as dark. He noticed a dark spot on the coat, but this was never confirmed in the record at trial as fact. He described the hair as "long, stringy" and dark. Later, when shown a wig allegedly worn by the robber, he was certain that was the wig because he thought the robber could be wearing one, but he wasn't sure at the time. It was the "same," however. Later, in response to a direct question, he stated, "I didn't see his hair at the scene, he had a hat on at the time." He described that hat as dark; an officer testified it was a black and gray checkered hat. At the preliminary hearing the victim described it as a "skullcap" of dark color. No testimony in the record provides a clear answer.

He was "sure" of the pistol, describing it as a "lugar [sic] type pistol." Later, he used the term "revolver," although he said he knew a little about firearms, and understood the difference. At one point, he referred to the weapon as a "luger type revolver." He was sure it was the same because it "was a dark color," but he acknowledged that 95% of all weapons of this nature are that color. He described the robber as having a mustache and being about "5'7"—5'8"," about 140–150 pounds. Never in the record are the height and weight of the defendant given.

He was, as we noted, "afraid," "fearful," but "calm" enough to know what the robber was dressed like. The Michigan Supreme Court noted in *People v. Anderson*, 389 Mich. 155, 205 N.W.2d 461, 470 (1973), citing Anastasi, Fields of Applied Psychology, 548 (1964), that " '. . . [c]ontrary to legal folklore, strong emotion at the time of observation or subsequent report tends to increase the probability of error.' " Hughes' statements are contradictory, I feel, and this fact weakens the reliability of his testimony.

## C. Accuracy of prior description.

The victim noted in court his previous identification of the defendant at the pretrial. He specifically remembered that he wore a "kind of green uniform," was handcuffed and accompanied by a sheriff.

He claims he was shown at least "50" mug shots, but no one substantiated this. He was never confronted with the defendant after the crime until the November 18, 1976 preliminary hearing. At that hearing he described the robber as wearing a dark color "skullcap" having "long-black-stringy hair"; "a rain jacket on, had dark pants, he also had a mustache." He was "sure" of his man.

As testified to by him, he gave a description to the police after the robbery, not mentioned in the testimony of the responding and investigating officers. He omitted mention of the mustache and of the hair length, because no one asked him, even though at trial he was "certain" they were the same.

## D. Level of certainty of the witness at the confrontation.

The witness-victim was always "sure," "certain" that the defendant was the right man—the man who robbed him on November 8, 1976—even though he was confused about the hat, ranging in his description from a dark, small skullcap to a small, dark hat, even though the officer described it as black and gray checkered; he was confused about the weapon; about the jacket; about the hair; the time; and even his reactions

to the event. He was "afraid," "fearful," but "calm."

He hardly appears to me to be certain about anything. He claims this certainty after briefly viewing a man wearing a hat of some description, having long hair, a long coat of some color, and dark pants. The only mention of a mustache came at the preliminary hearing of November 18, 1976, and at the identification in court, at trial. At neither proceeding did the defendant wear clothing anything like the alleged robber. In addition, I feel that this factor is not to be considered as primary. If any distinctive level of strength should be assigned to it, I feel it should be discounted rather than appreciated. Once the effect of the suggestive circumstances has come into play, the witness or victim, by repeated statements, may simply be reinforcing his own error. As Justice Marshall points out in *Manson v. Brathwaite*, 432 U.S. 98, 130–131, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), with citations, the degree of the witnesses' certainty is "worthless as an indicator that he is correct." Marshall quotes from *Wade*, supra, 388 U.S. at 229, 87 S.Ct. at 1933:

> " * * *  '[i]t is a matter of common experience that, once a witness has picked out the accused at the [pretrial confrontation], he is not likely to go back on his word later on  * * *.' " (Quoting from Williams & Hammelmann, Identification Parades, I Crim.L.Rev. 479, 482 (1963).

See also *People v. Anderson*, supra, especially the appendix discussion of cognitive dissonance, and *Foster v. California*, supra; "Certitude is not the test of certainty." O. W. Holmes, Jr., The Natural Law, 32 Harv. L.Rev. 40 (1918).

E. The length of time between the crime and the confrontation.

This is the most objective of the criteria, and the most difficult to assign value to. Here, the crime occurred on November 8, 1976. The victim first confronted the witness on November 18, 1976, then on December 2, 1976 (both at preliminary hearings) and, again, at trial on February 28, 1977. He claims he was shown about "50 mug shots" at some unspecified time in between; there is no other substantiation of this story, the officers who testified specifically denying any and all knowledge of this alleged fact.

3. The third factor to be considered is the "corrupting effect of the suggestive identification itself." *Manson v. Brathwaite*, supra.

Manson, after discussing *Neil v. Biggers*, supra, *Stovall v. Denno*, supra, and the other authorities, and, after adopting their analysis, stated as follows, 432 U.S. at 114, 97 S.Ct. at 1912:

> "We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-*Stovall* confrontations. The factors to be considered are set out in *Biggers*."

This is a factor also recognized in *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999; 26 L.Ed.2d 387 (1970). In *Coleman*, the court, although upholding the admissibility of the pre-trial identification, specifically noted the absence of suggestive influences and misconduct by the state. In this case, the preliminary hearing affords a clear example of such an abuse. We would be hard pressed to find a more flagrant example.

This court has generally adhered to the principle that to reverse "there must be prejudicial error, and the party appealing has the burden of showing such error." *Belondon v. City of Casper*, Wyo., 456 P.2d 238, 242 (1969), cert. den. 398 U.S. 927, 90 S.Ct. 1815, 26 L.Ed.2d 89. This principle is to some extent at least incorporated into Rule 49(a), W.R.Cr.P. which states that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." However, we do not find Wyoming precedent discussing the question of harmless error in the context of constitutionally impermissible conduct. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 15 L.Ed.2d 705, 24 A.L.R.3d 1065 (1967) is pertinent in that respect. After pointing out that all 50 states have harmless-error statutes or rules the court concluded that

there may be some constitutional errors "which in the setting of a particular case are so unimportant and insignificant" that they may be deemed harmless, "not requiring the automatic reversal of the conviction," 386 U.S. at 22, 87 S.Ct. at 827, but continued at pp. 23–24, 87 S.Ct. at p. 828:

" * * * We prefer the approach of this Court in deciding what was harmless error in our recent case of *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171. There we said: 'The question is whether there is a reasonable possibility that the evidence complained of *might* have contributed to the conviction.' *Id.*, at 86–87, 84 S.Ct. 229, 230. * * * An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy*, be conceived of as harmless. Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment. There is little, if any, difference between our statement in *Fahy v. Connecticut* about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that *before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.* While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard, although achieving the same result as that aimed

at in our *Fahy* case." (All emphasis added)

Insofar as the defendant has claimed violation of his rights under the Federal Constitution, the rule announced in *Chapman* is binding upon us. I consider that it is equally pertinent to rights asserted under our state constitution and that that test must be applied to the facts of this case.

I would also apply the principle that " '[p]rejudicial error is such error as in all probability must have produced some effect upon the final result of the trial,' " *State v. Reddington*, 80 S.D. 390, 125 N.W.2d 58, 62 (1973), quoting from *State v. Pirkey*, 24 S.D. 533, 124 N.W. 713, which in turn cited *State v. Britton*, 27 Wash.2d 336, 178 P.2d 341, reh. denied (1947). The Supreme Court of Washington later makes this pertinent observation in *State v. Martin*, 73 Wash.2d 616, 440 P.2d 429, 437, reh. denied, cert. denied 393 U.S. 1081, 89 S.Ct. 855, 21 L.Ed.2d 773:

" * * * When the appellate court is unable to say from the record before it whether the defendant would or would not have been convicted but for the error committed in the trial court, then the error may not be deemed harmless, and the defendant's right to a fair trial requires that the verdict be set aside and that he be granted a new trial."

The question is not whether the jury has made a sustainable choice but whether the process of making that choice has or could have been affected by improper evidence or some other irregularity in the proceedings. See *State v. Pirkey*, supra; *Commonwealth v. Cavell*, 244 F.Supp. 560, 567 (D.C.M.D.Pa. 1965), cert. denied 384 U.S. 1004, 86 S.Ct. 1921, 16 L.Ed.2d 1018, cert. denied 384 U.S. 1009, 86 S.Ct. 1986, 16 L.Ed.2d 1021.

The evidence at trial shows that police officers responded quickly to the report of the robbery. One officer located and in his patrol car followed a car which had pulled out from a street curb and went into an alley. He observed a man standing outside the car on the passenger's side who then ran out of sight. He continued his search, again losing contact, and then saw him

again when his companion officer had stopped the man and placed him in custody. On the ground and near the car, alongside of which this man had been seen, the officers found a wig, placed in evidence and concerning which Hughes testified as previously recounted. In the car and on the ground around the car there was found a considerable amount of currency, and a .22 caliber pistol was also found on the front seat of the car. This pistol was linked to the robbery by testimony of the state expert on firearms who said that an ejected cartridge found in the room where Hughes had been forced to lie down and a bullet had been shot into the counter, had been ejected from this pistol. We may therefore conclude that there was evidence, excluding the in-court identification by Hughes of the defendant, from which the jury *could* have found defendant to have been the robber.

However, the question is not what the jury might have done in the absence of the tainted testimony.

In conclusion, testimony of Hughes was of the greatest importance in tying the man first discovered beside that car which had tangible evidence relating to the crime to the man who had committed the robbery. We may not properly surmise that the jury ignored Hughes' testimony, unsatisfactory as it was, and I am unable to say that his identification was harmless beyond reasonable doubt. The pretrial identification was unnecessarily and impermissibly suggestive. Measuring the evidence in this case in accordance with the factors suggested in *Neil v. Biggers*, supra, and other authorities, I am unable to say that the subsequent in-court identification had an independent basis, and hence submit it was error to admit the same. The suggestive influences permeate this testimony too deeply for us to save it. While I agree that the law generally places questions of identity in the province of the jury, *Johnson v. State*, Wyo., 562 P.2d 1294 (1977), when this question of identity becomes tangled with conduct such as occurred here, it is the duty of this court closely to inspect lest constitutional rights become meaningless.

*People v. Anderson*, supra, contains an excellent discussion of the law and psychology of identification testimony and suggests that the dissipation of the taint necessary for proof on an independent basis must be proven by clear and convincing evidence. We perhaps go further when we adopt the rule stated in *Chapman* (as I think the majority does), but I am unable to declare a belief that the identification was harmless beyond a reasonable doubt.