Mikel James DERRICK, Appellant,

v.

The STATE of Texas, Appellee.

No. 68969.

Court of Criminal Appeals of Texas, En Banc.

March 1, 1989.

Rehearing Denied May 10, 1989.

Will Gray (court appointed on appeal), Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and Timothy G. Taft, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A., Penal Code § 19.03(a)(2). After finding the appellant guilty, the jury returned affirmative findings to the special issues under Article 37.071, V.A.C.C.P. Punishment was assessed at death.

The appellant was convicted of intentionally causing the death of Edward Sonnier in the course of committing and attempting to commit the offense of robbery. In eight related points of error, appellant argues that he was denied effective assistance of counsel. In points of error one and two, appellant argues that his trial counsel failed to object to an improper hypothetical scenario used by the State during voir dire. In points of error three through six, appellant argues that trial counsel allowed the State to misstate the law in such a way as to create reasons for excusing five potential jurors for cause. Point of error seven argues that unspecified procedural defaults by trial counsel prejudiced appellant. And, in his eighth point of error, appellant argues that trial counsel was ineffective because he opened the door to introduction of prejudicial evidence by the State. We will affirm appellant's conviction.

Appellant does not argue the evidence at trial was insufficient; therefore, only a brief recitation of the facts is necessary. On October 11, 1980, the nude body of Edward Sonnier was discovered in the bedroom of his Houston apartment. His throat had been cut, and his chest and back were penetrated by approximately fifteen deep stab wounds, any one of which could have been fatal. Five days later, Sonnier's car was discovered in Buna, Texas, stripped and abandoned. A police investigation eventually led to the arrest of Marshall Derrick, appellant's brother, in August of 1981. At the time of Marshall's arrest, appellant was serving a sentence in the Texas Department of Corrections on an unrelated conviction. Marshall's wife wrote to appellant and told him of his brother's arrest. Appellant wrote to the Harris County District Attoney's office, confessing that he, and not Marshall, was responsible for the murder and robbery. Houston homicide detectives interviewed appellant and obtained a number of confessions to the crime. Further investigation substantiated appellant's statements.

The proper standard for reviewing appellant's claim of ineffective assistance of counsel is set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See also *Hernandez v. State*, 726 S.W.2d 53, 56–57 (Tex.Cr.App.

1986) (adopting the *Strickland* test for ineffective assistance of counsel claims under the Texas Constitution). In order to reverse a conviction for ineffective assistance of counsel, we must find that an appellant has shown: (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Hernandez,* supra at 55 (quoting from *Strickland,* supra).

In his first two points of error, appellant complains of his trial counsel's failure to object to a hypothetical used by the State during voir dire. The prosecutor posited a situation in which a person robs someone and then kills the victim. Under this scenario, the prosecutor would suggest to a juror that such conduct would be both "intentional," within the meaning of V.T.C.A. Penal Code, § 19.02(a)(1), and "deliberate," within the meaning of Art. 37.071(b)(1) V.A.C.C.P. Next, the prosecutor would introduce a hypothetical "getaway driver." The prosecutor would explain how party culpability could be applied to the driver to make him responsible for "intentionally" killing the victim, although the driver would not have "deliberately" killed him. Appellant does not argue that this hypothetical misstated the law. C.f. *Lane v. State,* 743 S.W.2d 617 (Tex.Cr.App.1987). Instead, appellant asserts that because the issue of party liability, as expressed in the hypothetical, was not present in appellant's case, the hypothetical had the potential of confusing or prejudicing the jury to appellant's detriment.

In support of the contention that the State's repeated reliance on this hypothetical was error, appellant cites *Esquivel v. State,* 595 S.W.2d 516 (Tex.Cr.App.1980). Contrary to appellant's characterization of *Esquivel,* [prohibiting a defense attorney from voir diring a juror on his understanding of the terms "deliberate" and "in-

tentional,"] that case merely holds that it was not an abuse of discretion for a trial judge to disallow voir dire on this issue. *Id.* at 525. Appellant cites no other authority for the proposition that it would be error to allow this hypothetical to be presented to a venireman.

■ Appellant does, however, argue that a juror might have been lead to believe that a finding of intentional conduct will inevitably lead to a finding of deliberate conduct in all cases except those closely matching the "wheel-man/trigger-man" hypothetical. We reject this contention. Nothing that the prosecutor said indicated that his hypothetical scenario exhausted the distinction between intentional and deliberate conduct. Absent even a hint from the prosecutor to the jury that it should automatically answer the first special issue affirmatively, we will not assume that the jury made this unjustified inferential leap. Appellant's counsel could well have made a tactical decision to refrain from alienating a venireman [by objecting to the hypothetical], knowing that there was no firm legal basis on which to object and that the prejudicial effect of the hypothetical was, at best, speculative. Appellant's attorney may have hoped to gain greater latitude in the scope of *his* voir dire by allowing the State to use the hypothetical. Finally, by listening to the jurors' responses to the hypothetical, appellant may have received information and insight useful in the exercise of *his* peremptory challenges.[1] This Court will not use hindsight to second guess a tactical decision made by a trial attorney which does not fall below the objective standard of reasonableness. *Butler v. State,* 716 S.W.2d 48, 54 (Tex.Cr.App.1986). We find that allegations made in points of error one and two do not satisfy the first prong of the *Strickland* test; consequently, these points of error are overruled.

In points of error three through six, grouped by appellant, appellant argues that his trial attorney allowed the prosecu-

---

1. We note that even appellant's counsel on the instant appeal has argued before this Court that such information would be useful to a defense attorney in exercising his peremptory challenges. See *Hogue v. State,* 711 S.W.2d 9, 27 (Tex.Cr.App.1986).

tor to misstate certain constitutional rights granted to the appellant in such a way to allow the State to "manufacture" grounds for excusing veniremen Ramirez, Philio, Sherrod, Daniels, and Wells for cause, thus effectively providing the State with an additional five peremptory challenges. Appellant does not argue that this procedure constituted prosecutorial misconduct nor does he claim as error the trial judge's exclusion of any of the venireman. Appellant limits these points of error to the argument that the State was allowed the equivalent of five "free" peremptory challenges.

In all five complained-of instances, the prospective juror testified that he or she could not return a verdict without first hearing testimony from the appellant. Appellant characterizes such a challenge as a "defense challenge" which may not be properly made by the State. We reject this contention. We have never held that a challenge for cause which generally inures to the benefit of a defendant becomes the sole province of the defendant. E.g., *Bodde v. State*, 568 S.W.2d 344, 349 (Tex. Cr.App.1978) (juror would hold State to higher burden of proof on second special issue); *Moore v. State*, 542 S.W.2d 664, 668–69 (Tex.Cr.App.1976) (State's challenge for inability to consider minimum punishment for a lesser included offense). Finally, even if trial counsel had a valid objection to excusal of these prospective jurors or of the State's manner of conducting this voir dire, appellant has failed to assert that there were no valid, tactical reasons why trial counsel would have wanted these jurors excluded. And, if appellant had made such an assertion, the record is devoid of any support for that position. Appellant has failed to satisfy the second prong of the *Strickland* standard. Points of error three through six are overruled.

In his seventh point of error appellant alleges that trial counsel failed on numerous occasions to make contemporaneous objections. Appellant fails to cite to a single example of default in the record. For this reason, nothing is presented for review. Point of error seven is overruled.

Appellant argues in his final point of error that he was denied effective assistance of counsel because his trial attorney opened the door to evidence that appellant was a prostitute and a homosexual and that the deceased was peacable and not a violent person.

The State offered a portion of appellant's extrajudicial, tape-recorded confession, in which appellant stated, "But I was sitting there and he [the deceased] came up and then went into the bedroom and I just whipped out my knife and stabbed him." This statement represents a severely abridged version of appellant's actual confession. Trial counsel introduced all of the remainder of appellant's confession into evidence, which reflects that the deceased physically overpowered the appellant and threw him onto a bed, whereupon appellant struggled free and warned the deceased against further attacks. Only after the deceased then repeated his assault did the appellant, according to his full confession, stab the deceased with a knife. Unfortunately, the appellant's full confession also includes the following statement: "He [the deceased] had no clothes on and he tried— he tried to tell me that he wanted to do something. I told him 'No.' I said, 'there ain't no way. I don't mess around that way.'"

This statement seemingly invited testimony regarding appellant's previous homosexual activities, some of which constituted prostitution and the "rolling" of his sexual partner. Accordingly, appellant now characterizes his trial attorney's judgment as uncritical, suggesting that counsel might instead have offered that portion of the confession necessary to place self-defense in issue without also intimating that appellant's encounter with the deceased was homosexual in nature. Essential to this argument is the notion that, had the State then been forced to introduce these parts of the confession, it would have been bound by them. Particularly, it is now appellant's contention that the prosecution would not have been permitted to disprove the statement, "I don't mess around that way," with

prejudicial evidence of appellant's prior homosexual conduct.

■ Of course the matter is not quite so simple as this. The State is bound to disprove defensive, and perhaps any exculpatory, material which it has put into evidence through a confession of a defendant. *Palafox v. State,* 608 S.W.2d 177 (Tex.Cr. App.1980).[2] However, it is not bound to disprove, let alone accept as true, every incidental averment of the confessions it introduces, nor is the jury obliged to believe all such averments. Whether appellant was a practicing homosexual cannot fairly be described as a defensive issue.

On the other hand, the State may not set up a straw man to knock down with unfairly prejudicial evidence. See *Bates v. State,* 587 S.W.2d 121, 140 (Tex.Cr.App.1979) (opinion on appellant's motion for rehearing). Had trial counsel not introduced those parts of appellant's confession which suggested a homosexual encounter, he might have sought to bar the prosecution from introducing them upon the ground that their prejudicial effect far outweighed their probative value. Indeed, he might fairly have argued that the statements had no probative value and were, thus, irrelevant.

Failing this, if the prosecution had then contended for admissibility to show motive or context, the most plausible basis for allowing the evidence would have been to prove that the appellant was moved to homicide in part by a personal aversion to homosexual contact. Given this purpose, however, the prosecution could not fairly be permitted to disprove its own theory of motive by evidence of appellant's past homosexual activity. See *Bates,* supra.

■ This brings us to the question of whether evidence concerning appellant's past homosexual activity was, indeed, objectionable. Appellant's contentions imply that such evidence would not have come in had defense counsel not opened the door. But, this is not clear to us from an examination of the appellate record. To the extent that the homosexual encounter between appellant and the deceased provided the occasion, motive, opportunity, and was arguably part of a continuing scheme by appellant to commit robbery of homosexual victims in Houston, evidence of appellant's past criminal and homosexual conduct might arguably have been relevant to prove intent, without trial counsel first opening the door. As such, the only remaining question would be whether the unfair prejudice of the testimony would substantially outweigh its probative value. See *Plante v. State,* 692 S.W.2d 487 (Tex. Cr.App.1985).

While we express no opinion concerning the admissibility of evidence under any of the theories or strategies discussed above, we note that a very complex problem has been grossly over simpified by the appellant in his brief to this Court. The very complexity of this issue serves to place trial counsel's decision to introduce the remainder of the confession well within the bounds of acceptable professional representation. Absent some further showing concerning the basis for trial counsel's reason for making this decision, we find that he did not violate the first part of the *Strickland* test by introducing the remaining portions of appellant's confession. Point of error eight is overruled.

Finding each of appellant's individual allegations of ineffective assistance of counsel to be without merit, we also find that counsel's overall representation was effective.

The judgment of the trial court is affirmed.

CLINTON, TEAGUE and DUNCAN, JJ., dissent with opinion.

CLINTON, Judge, dissenting.

Accepting *obiter dictum* of *Hernandez v. State,* 726 S.W.2d 53, at 55–57 (Tex.Cr. App.1986) ("[W]e will follow in full the *Strickland* standards in determining effective assistance of counsel and prejudice resulting therefrom."), today the majority purports to undertake to make dual determinations prescribed in *Strickland.* As

2. However, see current Tex.R.Crim.Ev. 607, not in effect at the time of appellant's trial.

Judge Teague demonstrates, we should address the issues conformably to the Constitution and law of this State.

Having deplored "gratuitous abdication of the duties of responsibilities of this Court" by the majority in *Hernandez v. State,* supra, (Concurring Opinion, 59, at 64), I merely observe that throughout its opinion in the instant cause the majority does not measure claimed failings of counsel by "an objective standard of reasonableness;" rather, it surmises theoretical "tactical decisions" perhaps justifying them or lack of "showing" of actual basis for a decision. Moreover, overall it makes much the same mistake in its application of the *Strickland* "standards" as the *Hernandez* majority did, *viz:*

> "... Point by point, the majority isolates each failing of trial counsel and concludes that that particular failure did not undermine confidence in the result of the trial[.] * * * * But this is not the way to test appellant's claim of ineffective assistance, even under *Strickland.* Under that standard, appellant 'must show that there is a reasonable probability that, but for counsel's unprofessional %Errors, *the result of the proceeding would have been different.' 104 S.Ct. at 2068. It is the cumulative effect of counsel's errors that must be evaluated, not the effect of each individual error."*

*Id.,* at 63 (my emphasis).

Accordingly, I respectfully dissent.

1. In *Wilkerson v. State,* 726 S.W.2d 542, 550 (Tex.Cr.App.1986), this Court, over the dissents of Judge Clinton and myself, expressly adopted "the standard set forth in *Strickland* ...", including its harmless error component. The issue in *Wilkerson* was, however, resolved without the necessity of a prejudice inquiry.

Later, in *Hernandez v. State,* 726 S.W.2d 53 (Tex.Cr.App.1986), we specifically considered whether the *Strickland* analysis should guide this Court in interpreting the Texas constitutional right to effective assistance of counsel, and held that "we will follow the *Strickland* standards in determining effective assistance and prejudice resulting therefrom." *Hernandez,* supra at 57. In what will no doubt become an analytical paradigm, and without articulating a single cogent reason for its conclusion, this Court held:

> It is obvious from a review of the entire record that in certain respects trial counsel

TEAGUE, Judge, dissenting.

Prior to *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the State of Texas had gone some distance in articulating the law of attorney effectiveness in the context of criminal defense. See Clinton & Wice, *Assistance of Counsel in Texas,* 12 ST. MARY'S L.J. 1 (1980). It is regretable that we should abandon this work simply because, as a matter of federal constitutional law, the United States Supreme Court has now laid down a method for evaluating the threshhold level of performance demanded by the United States Constitution.[1] Indeed, it is probable that the Supreme Court's relative generality in recent years is intended to spur the several states toward a more detailed and comprehensive assessment of their own constitutions and statutes, unhampered by precise rules from the federal courts when more general guidelines will do. See e.g. Abrahamson, *Criminal Law and State Constitutions: The Emergence of State Constitutional Law,* 63 TEX.L. REV. 1141 (1985). Ironically, the behavior of this Court has been slavish. It seems we do not want our freedom, and would rather the Supreme Court of the United States simply tell us what to do. I urgently dissent to this disturbing trend.

In years past, it was natural that this Court's interpretation of fundamental rights coincide rather exactly with Su-

> rendered sub-par assistance. But in the particular instances where this occurred, it has not been shown, as required by *Strickland,* that there is a reasonable probability, or probability sufficient to undermine confidence in the outcome, that the result of the proceeding would have differed had trial counsel's assistance been effective.

*Hernandez,* supra at 59. In a separate opinion, I dissented to the holding but concurred in the result. Judge Clinton, joined by Judge Miller, also disagreed entirely with the majority analysis, although concurring in the result. And Judge Campbell, without expressing his reasons, refused to join the Court's opinion, and concurred in the result only. Evidently there is a good deal more to be said about the application of *Strickland* in Texas. See *Jackson v. State,* 766 S.W.2d 518 (Tex.Cr.App.1988) (Teague, J., dissenting).

preme Court case law. At a time when our nation's highest court was actively expanding the scope of constitutional protection, the threshold generally exceeded that promulgated by state governments. Accordingly, the Supreme Court devised elaborate procedural schemes to promote implementation of its new agenda. But the applicability of federal constitutional rights to the states is now rather well-settled, and the Supreme Court has begun to express the scope of those rights in more general language. Compare *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) with *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The first part of the *Strickland* holding reflects this trend. Thus, the level of performance which is to be expected from criminal defense attorneys is largely made to depend upon a case-by-case application of general principles by state appellate courts. But the second part of *Strickland*, supra 466 U.S. at 693, 104 S.Ct. at 2067, 80 L.Ed.2d at 697, holds that the United States Constitution will not be offended should a state place the burden of showing harm upon the criminal appellant rather than upon the prosecution.

I think it manifestly improper and unjust to assign the burden of persuasion in this way. Indeed, I believe that the Supreme Court will ultimately retreat from such a position itself, because it is essentially unworkable in practice. The harmless error rule is, at least conceptually, a response to the technicalities which have plagued the law of pleading, evidence, and procedure for hundreds of years.[2] It flows naturally from the indubitable truth that goals of the criminal justice system are not well-advanced when convictions must be reversed for "errors" which did not deprive the accused of a fair and impartial trial. Unfortunately, determining whether a trial was fair has come to mean predicting whether the jury, or other factfinder, would have reached a different result absent the error. And no one has yet articulated a satisfactory method for making such predictions in a principled way.[3]

What is so often apparent in the opinions of appellate court judges is that the harmfulness of an "error" can only be gauged by the personal reaction of an individual to it. The appellate court judge must imagine that he stands in place of a juror and, taking the record of the trial as a whole, must faithfully ask himself whether he would convict had the "error" not been committed. If he pretends, as a way of speaking, that the question concerns not himself but the foreman of an actual jury, or even twelve jurors collectively, no one is

---

2. The doctrine has been subjected to sporadic scholarly comment from early in this century, most of it highly critical. See generally, R. Traynor, *The Riddle of Harmless Error* (Ohio State University Press 1970); Goldberg, *Harmless Error: Constitutional Sneak Thief*, 71 J.CRIM.L. 421 (1980); Field, *Assessing the Harmlessness of Federal Constitutional Error—A Process in Need of a Rationale*, 125 U.PA.L.REV. 15 (1976); [Winslow] Note, *Harmful Use of Harmless Error in Criminal Cases*, 64 CORNELL L.REV. 538 (1979); Saltzburg, *The Harm of Harmless Error*, 59 U.VA.L.REV. 983 (1973); Mause, *Harmless Constitutional Error: The Implications of Chapman v. California*, 53 MINN.L. REV. 519 (1969); Note, *Harmless Error Rule Reviewed*, 47 COLUM.L.REV. 450 (1947); Collier, *Harmless Error*, 72 CENT.L.J. 151 (1911); Freerks, *Error is Presumed to be Prejudicial Unless It Affirmatively Appears that It Is Not*, 70 CENT.L.J. 52 (1910).

In a civil context under Texas law, the doctrine has been analyzed by former Chief Justice Calvert, one of its leading proponents. See Calvert, *The Development of the Doctrine of Harm-* *less Error in Texas*, 31 TEX.L.REV. 1 (1952); Calvert & Perrin, *Is the Castle Crumbling? Harmless Error Revisited*, 20 S.TEX.L.J. 1 (1979); Calvert, 20 St. Mary's Law Journal Number 2 (1989).

3. As part of the ongoing debate concerning statistics and the law of evidence, burdens of proof, and standards for review, it has been argued that mathematical methods can be made to solve problems of quantification and prediction in this area. See Kornstein, *A Bayesian Model of Harmless Error*, 5 J.LEGAL STUDIES 121 (1976). Even a cursory reading of the article should make it clear why such an analysis has not been attempted by appellate courts, although it merits greater judicial attention than it has thusfar received.

For a more familiar approach to the practical utility of analyzing prejudice, see [Pondolfi] Note, *Principles for Application of the Harmless Error Standard*, 41 U.CHI.L.REV. 616 (1974). Also [Skoglind] Comment, *Harmless Constitutional Error: An Analysis of Its Current Application*, 33 BAYLOR L.REV. 961 (1981).

fooled into thinking that he really knows how a particular juror or group of jurors were affected by the "error". We know that he speaks for himself and that, in saying the juror or jurors would not have reached a different decision, he means that they would have reached the same decision he reached.[4] He cannot quantify the probable truth of his conclusion, nor can he even elaborate his reasons for it. He can say why the "error" would not have affected his own decision, or why it would have made no contribution to his own verdict, Tex.R.App.Proc., rule 81(b)(2), but he cannot say why he believes it would not have affected the decision of others. Anyone who cares to undertake an inquiry will likely find that no written opinion of any appellate tribunal has ever given a satisfactory basis for concluding that jurors would have returned the same verdict regardless of legal error in the case.

I am generally opposed to the so-called "harmless error rule" for this very reason. In our system of justice, fairness and impartiality are produced, if at all, by operation of legal rules and by the assignment of adjudicatory responsibilities. Those who fashion these rules, including the legislative and judicial branches of government, may be expected to consider the efficacy of what they produce and to decide what rules and standards are necessary to achieve fairness in the system as a whole. When a procedural or evidentiary rule seems not to work well, or when it seems to produce unjust results, the remedy is to amend or repeal it. The harmless error rule does neither. It leaves the law fully intact, but authorizes appellate court judges to pardon

the violation of any legal precept, constrained only by their personal views of fairness and justice. This is not the sort of method Texans have a right to expect in a government of laws.

I do not mean to suggest that appellate court judges are less qualified than jurors to decide ultimate issues of guilt and innocence. But in our system of criminal justice, such decisions are not a part of their adjudicatory responsibilities, and it is an outrageous travesty to confer such authority upon them by subterfuge. The harmless error rule, particularly when created by judicial review, represents a seizure by the bench of veto power inconsistent with its proper role in government.[5] Bound to apply the law, appellate court judges may not conscionably refuse to do so even when the consequence seems manifestly unjust. They may, of course, fairly interpret statutes and binding precedent so as to harmonize inconsistencies and effectuate legislative intent. They must necessarily strike down legislation which offends the supreme law of Texas and of the United States. They may even abandon judicial precedent outright whenever changes in the law and public policy indicate a need. But they may not simply except individual cases from the rule of law.

The American jury trial has become an enormously complex thing, and the potential for malfunction commensurately great. Perhaps it is no longer reasonable to suppose that trial judges and attorneys can discharge their respective functions without violating the law themselves. If this is so, the problem runs much deeper than any

---

4. In fact, judges are much more likely than juries to regard the evidence of guilt as persuasive, at least in most cases which actually come to a jury trial. Kalven & Zeisel, *The American Jury* (Univ.Chi.Press 1971). Thus, the kind of judicial hyperbole one commonly encounters in harmless error opinions, insisting for example that the evidence of guilt was "overwhelming", should not be taken as a competent assessment of juror beliefs.

5. I recognize that statutory authority for the harmless error doctrine exists throughout the United States. To the extent that its application is so founded, as it is for example in *Almanza v. State,* 686 S.W.2d 157 (Tex.Cr.App.1984), a prej-

udice review by the judiciary is not without legal support. However, I don't believe that a fair construction of the statutory language found in Art. 36.19, V.A.C.C.P. militates in favor of any methodology for predicting what an actual jury would have done absent the error. Rather, in *Hayes v. State* (Tex.Cr.App. No. 955–82, delivered March 12, 1986, Teague, J., concurring) (unpublished) and *Black v. State,* 723 S.W.2d 674, 682 (Tex.Cr.App.1986, Teague, J., dissenting), I have urged an alternate objective test for determining the harmfulness of jury charge error. Of course, other sources of the rule, such as Tex.R.App.Proc., rule 81(b)(2), may not be susceptible of such interpretation.

formulation of the harmless error rule can hope to sound. But I am not convinced that the system itself is fraught with such traps that a capable practitioner cannot avoid failing his professional responsibility.

For example, virtually all rules of evidence and many rules of procedure exist at the option of the parties. Unless irregularities in methods of proof are objected to, no error is likely to occur at all. Unless certain procedures are requested, such as the assessment of punishment by a jury or specific instructions from the trial judge, their omission is usually not improper. Our case law is literally bursting at the seams with examples of waiver and forfeiture which run the gamut of potential errors that never became actual. "Harmless error" exists only to excuse that which, after everything else is said and done, should be inexcusable—the contumacious refusal of a trial judge or a lawyer to do what the law requires, even when he knows or should know better.

Perhaps there is a small minority of cases in which some rule of law, not susceptible of greater precision, was violated in a way such that the logical possibility or probability of a different result was not appreciably affected. I am inclined to think, however, that no such case exists in which a better formulation of the rule, or even its complete abandonment, would not produce a more sensible remedy to the perceived injustice than a dubbing of "harmless" by judicial fiat. Still, given the fallibility of human prediction, I am willing to concede that the prosecution should be permitted an opportunity to prove the harmlessness of any given error in its unique factual context. This, of course, means persuading an appellate court to a high degree of confidence that the error did not contribute to the result, even though such errors do affect the result in most

cases. See e.g., Tex.R.App.Proc., rule 81(b)(2).

Having found that an error was properly, specifically, and timely preserved, that it was neither waived, forfeited, nor cured, and that the violated precept either cannot or should not be changed, it represents the most extreme disrespect for our system of justice to further require that the injured party bear the burden of proving harm. There should be no rule of law in our jurisprudence the violation of which is harmless in more than a miniscule number of conceivable cases, e.g. *LaPoint v. State*, 750 S.W.2d 180 (Tex.Cr.App.1988), nor have we any need of such a rule. Obliging a party who has been wronged to further show that he does not fall within a class this insignificant is illogical and antisystemic.

Yet we know from *Strickland* that the United States Constitution condones such an obligation. That does not mean, however, that the State of Texas must condone it. As has long been clear from our published opinions in this area of law, the effective assistance of counsel is not to be found in a catalog of "dos and don'ts". We have not yet undertaken to prescribe a list of exercises, all or most of which must be performed by attorneys in every criminal case. Nor even have we sought to compile fatal defects which, if they occur, will necessarily vitiate a criminal conviction. I believe that the effective assistance of counsel must be gauged by the overall performance of an attorney, bearing in mind that it is his responsibility to investigate the facts of the case, examine the evidence, research the law, and present his client's case to judge and jury in a way which seems best to him. His judgments must be educated, informed, and reasonable, but they are his judgments, constrained only by the ethics of his profession, the instructions of his client, and his own preparedness to make them.[6]

---

6. I believe that Texas should, as a matter of its own constitutional law, if not by legislative or judicial rule-making, establish minimum standards of performance for attorneys in criminal cases. See e.g. Erikson, *Standards of Competency for Defense Counsel in a Criminal Case*, 17 AM.CRIM.L.REV. 233 (1979). The difficulties,

of course, are legion, but even having accepted *Strickland* in its entirety, the opinions of this and the intermediate appellate courts, by applying the standard, will certainly bring us on a case-by-case basis to this result anyway. Far better, in my opinion, to do a little constructive thinking about it in advance, especially since a

Thus, I have no difficulty joining the United States Supreme Court in its conclusion that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064, 80 L.Ed.2d at 692–693. But, in my view a "just result" is one produced when the system designed to produce it functions properly, within the tolerances prescribed by law, and not one in which the verdict happens to comport with extrasystemic, individual, or majority notions of justice. Therefore, if "counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment", *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693, the trial cannot be relied upon, in my view, to have produced a just result.

I cannot, without violating my commitment to the system itself, subscribe to the doctrine that an accused whose representation was so grievously deficient as to satisfy the first prong of *Strickland* must also "show that the deficient performance prejudiced the defense." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. And I am especially reinforced in my belief by the Supreme Court's peculiar idea that prejudice is shown to exist when "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at

687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. It bears repeating that the result of a trial is reliable if, and only if, it has been arrived at in the manner required by law. It is never reliable when it has not been. All trial results in which the accused has not received the effective assistance of counsel under circumstances where he is entitled to such assistance are unfair by definition and, therefore, necessarily unreliable. Our system prescribes no method for determining reliability outside of itself.

Consequently, to the extent that *Strickland*'s second prong requires an analysis different than the first, it is surely wrongheaded, as are all typical formulations of the harmless error doctrine which impose upon appellate court judges a responsibility to predict what the outcome of trial would have been absent the error. Because the system offers no objective method according to which such predictions can be made, reviewing courts must determine the question subjectively. It would nearly always be possible, of course, to summon back the jurors and require them to testify regarding the basis for their verdict.[7] In this way, some reasonably pertinent evidence might be obtained concerning the probability of a different result. But again, our system seems to preclude any such methodology.[8]

Accordingly, requiring the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

---

considerable body of heretofore authoritative case law in this State provides a rather fertile basis in common law experience for doing so.

**7.** But see Tex.R.Crim.Ev., Rule 606(b), which provides in part that:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify as to any matter relevant to the validity of the verdict or indictment.

The language of this rule was taken almost verbatim from the Federal Rule of Evidence having the same number, except that theirs is

not self-contradictory. Because the rule only applies on its face to "inquir[ies] into the validity of a verdict or indictment", one might argue that it doesn't control at a harmless error hearing, the result of which could not conceivably affect validity of the jury's verdict.

**8.** In *Hernandez,* supra at 59, we left the appellant "free to develop the facts further in a postconviction habeas hearing," although I suspect that any effort on his part to show prejudice at such a hearing by producing the best evidence of it, the jurors who convicted him, would be regarded with astonishment by a majority of this Court, irrespective of Tex.R.Crim.Ev., Rule 606(b). See *Rose v. State,* 752 S.W.2d 529, 541 (Tex.Cr.App.1987) (Teague, J., concurring & dissenting).

have been different", *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698, produces a catch–22 in the law. It imposes a burden of proof on the one hand and withholds the only real evidence available to meet it on the other. Appellate court judges are left to speculate regarding the probable impact of deficient representation on the unknown cogitations of particular jurors, which is precisely what the Supreme Court proceeded to do in Part V of its *Strickland* opinion.

Even assuming that such jurors "reasonably, conscientiously, and impartially appl[ied] the standards that govern the decision", without "unusual propensities toward harshness or leniency", *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068, 80 L.Ed.2d at 698, it remains the province of the factfinder to weigh evidence, determine the credibility of witnesses, and compare inferential strengths and weaknesses against the standards of proof prescribed by law. Each of these functions is highly subjective and is an adjudicatory responsibility of the jury alone under our system of criminal justice.

To know the probability of a different result, therefore, requires some knowledge of actual juror beliefs concerning the evidence adduced at trial. Yet the Supreme Court has held that "evidence about the actual process of decision, if not part of the record of proceeding under review, ... should not be considered in the prejudice determination", even though "[i]n making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. It follows from this that the reviewing court, although bound by the evidence, is obliged independently to determine its credibility, to weigh it, and to assess the strengths of any inferences from it, since the probability of a different result cannot meaningfully be decided without knowing these things. A powerful bit of evidence, utterly disbelieved, is no evidence at all, and can alter dramatically the result of a trial. A compelling inference from evidence given little weight is a weak inference indeed. These things are for the jury, not for appellate court judges, and under our system of justice fair and reliable verdicts can only be expected when defendants have an absolute right to insist that all questions of weight and credibility be decided by a jury.

The harmless error rule, in its various guises, is now, perhaps more than ever, the most popular judicial expedient for avoiding reversal in the face of undisputed trial error.[9] Since harmless error is an appellate doctrine, having no logical place at trial, the burden of proving it is one of persuasion only. Additional evidence, beyond that contained in the record of trial, need not be adduced by either party. Indeed, no mechanism even exists to do so, unless we propose to sanction new trial hearings for this general purpose at which the accused is permitted to examine jurors regarding the basis of their verdict. Otherwise, the probability of a different outcome, absent the error, must be gleaned somehow from a record which necessarily includes no evidence directly pertinent to the inquiry.

How one assigns the ultimate burden, therefore, will usually be dispositive of the issue. In short, the party to whom it falls will usually lose. The fact that this is not

**9.** These guises are various, but all have in common the notion that errors should not require reversal when they don't affect the outcome of trial. The principle difference between the most common formulations of the rule is in the the burden of persuasion and its standard. For example, sometimes the rule requires the beneficiary of the error to show beyond reasonable doubt that it did not affect the outcome of trial. E.g., *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Tex.R.App. Proc., rule 81(b)(2). Sometimes, on the other hand, it requires the victim of the error to show that there is a probability of varying or unspecified magnitude that the error did affect the outcome. E.g., *Strickland v. Washington,* supra. And sometimes the rule is even more complicated, requiring the victim of the error to demonstrate a greater or lesser probability of a different outcome depending upon whether the alleged error was objected to at trial. E.g., Art. 36.19, V.A.C.C.P. as interpreted by this Court in *Almanza v. State,* supra. No doubt, a great number of other variations on the same theme exist both here and in other jurisdictions.

invariably so only serves to demonstrate that application of the harmless error rule is essentially unprincipled. Accordingly, where convictions are reversed based upon an appellate finding of harmfulness, one senses that the driving force behind the decision is a vague feeling of injustice on the part of some higher tribunal. Unable to articulate its reasons in logical fashion, the court instead speculates about unquantifiable risks. Its language typically represents a policy rationale against the kind of error in question, not an explanation of why the error is harmful in some cases and not in others. If called upon for a more principled analysis, the court can reliably be expected to respond with an apologetic protest that each case must be decided upon its own facts. General principles, of course, have no place in a scheme where each case is utterly unlike every other.

Appellate court judges are not supposed to engage in factfinding. In particular, their province is thought to preclude substitution of judgment for that of the jury. Thus it is much easier for them to conclude that even a rational juror might as likely have found the accused guilty had the error not been committed. The conclusion is difficult to gainsay. Indeed, in light of our exposure to the aggregate technicalities of trial practice, including the myriad rules of evidence and procedure, and particularly as compared with ordinary notions of right and wrong common to the general public, it is not at all improbable that a verdict of guilt would result just as often in any given case if the trial judge committed fifty or hundred errors more than he did in fact.[10]

Deciding what should matter in litigation has always been the province of law. If it is now to be measured against the probability of a different jury verdict, then it would be far better to abandon the legal rules in straightforward fashion than to disguise their repealer with a candy coating of harmless error. The violation of a legal rule at trial is, or should be, a serious matter. If it is not, even in most cases, it should either be rewritten or abandoned. That which does not serve, in the best judgment of a community, to accomplish the legitimate ends for which it was intended desperately needs reforming.

The harmless error component of the *Strickland* test has been criticized by commentators fairly uniformly. Some take the view that a rule of actual prejudice should not apply to Sixth Amendment violations at all, since the Constitution means to preserve the efficacy of adversarial process, a systemic prerequisite to fair trials in this country. Gabriel, *The Strickland Standard for Claims of Ineffective Assistance of Counsel: Emasculating the Sixth Amendment in the Guise of Due Process,* 134 U.PA.L.REV. 1259 (1986). Others argue that the rule, even if legitimate, improperly assigns the burden of proof. [O'Brien] Comment, *Judicial Jabberwocky or Uniform Constitutional Protection? Strickland v. Washington and National Standards for Ineffective Assistance of Counsel Claims,* 1985 UTAH L.REV. 723; Genego, *The Future of Effective Assistance of Counsel: Performance Standards and Competent Representation,* 22 AM. CRIM.L.REV. 181 (1984). Both positions have merit, in my view, although the latter is easiest to defend.

Certainly if we have a need to embrace the harmless error rule as a safety valve for that minority of cases in which violation of a legal precept, although error, was unlikely to have actually affected the fairness of a trial or its outcome, there is no excuse for not burdening the prosecution with an obligation to persuade appellate courts of this extraordinary fact. Fault has nothing to do with it. It is unfortunate that ineffective counsel, brought about not by any shortcoming of the state but by deficiencies in the performance of a defendant's own lawyer, should result in a benefit to him and a waste of judicial resources.

---

**10.** Perhaps I should say that it would seem so to practitioners of the criminal law, trial and appellate court judges, since there is some sociological research to suggest that the faithful observance of "technicalities" does, indeed, affect the outcome of trial, at least from the perspective of jurors. See e.g. Roper & Melone, *Does procedural due process make a difference? A study of second trials,* 65 JUDICATURE 136 (1981).

But representation by an attorney whose performance is so deficient as to violate his own client's constitutional rights is no windfall. It is exactly the kind of egregious failure that should undermine everyone's confidence in the verdict, unless that confidence can persuasively be restored by the prosecution.

For these reasons, I dissent to this Court's wholesale adoption of *Strickland.* Its harmless error component is, at best, needless, and its assignment of the persuasive burden clearly wrong. We are not bound to apply it under the Texas Constitution, and should not do so. Therefore, expressing no opinion with respect to the constitutional adequacy of defense counsel's performance in the instant cause, I am unable to join the majority's opinion.[11]

DUNCAN, Judge, dissenting.

Irrespective of whether one relies upon the standards of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) or *Ex parte Duffy,* 607 S.W.2d 507 (Tex.Cr.App.1980) [which I prefer, see *Ex parte Cruz,* 739 S.W.2d 53 (Tex.Cr.App.1987) (Duncan, J., dissenting)], counsel in this case was appallingly ineffective.

---

**11.** A claim of attorney ineffectiveness cannot actually be determined under any standard without an evidentiary hearing. See e.g. *Hernandez,* supra at 64, 66 (Teague, J., concurring and dissenting). I refer here to the question of defense counsel's performance, as contemplated by the first prong of *Strickland,* although my remarks apply with even greater force to the prejudice inquiry. The record of trial alone will rarely, if ever, reflect a dispute concerning the issue, and because the professional judgments of a licensed attorney are necessarily in question, it is impossible to measure the reasonableness of those judgments from an examination of the appellate record alone. See *Ex parte Duffy,* 607 S.W.2d 507, 513 (Tex.Cr.App.1980). Therefore, whenever ineffective assistance of counsel is raised for the first time in an appellate court, based upon deficiencies in the performance of a defense attorney, I would abate the appeal and remand the cause for an evidentiary hearing in the trial court, as appellant requests. My brethren have yet to articulate any legal or policy inhibition to this procedure, and I see none. Moreover, it has the advantage of avoiding piecemeal litigation, which necessarily attends postconviction habeas corpus proceedings, the method currently favored by a majority of this Court. Thus, given a presumption of adequacy and a record barren of any evidence sufficient to overcome the presumption, the points of error in this cause, as in virtually all others, must be overruled in the absence of remand for further development of the evidence. Compare *Janecka v. State,* 739 S.W.2d 813, 841 (Tex.Cr.App.1987)(on appellant's motion for rehearing).