Michael GENTRY, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 89–289.

Supreme Court of Wyoming.

Feb. 19, 1991.

Public Defender Program: Leonard D. Munker, State Public Defender, Cheyenne, and Barbara L. Lauer, Asst. Public Defender, Laramie, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Karen A. Byrne, Sr. Asst. Atty. Gen., Kaylin D. Kluge, Asst. Atty. Gen., Cheyenne, for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

GOLDEN, Justice.

Appellant Michael Gentry, convicted by a jury of stealing a motor vehicle under W.S. 6–3–402(a) and (c)(i) (June 1988 Repl.), claims that the trial court committed reversible error when it ruled that his counsel could not elicit the fact of Gentry's prior convictions upon direct examination. Gentry states the issue to be:

> The trial court, having issued a ruling in limine allowing the prosecutor to inquire into defendant's prior convictions on cross-examination under Rule 609(a), W.R.E., erred and abused his discretion in refusing to allow defendant to testify

to those prior convictions on direct examination, prejudiced the defendant, and infringed his constitutional right to a jury trial.

The state restates the issue:

Whether the trial court committed reversible error under W.R.E. 609 in not permitting appellant to testify to his prior convictions on direct examination?

We affirm.

## FACTS

The state's theory of the case was that Gentry and his business associate, Jim Lariviere, co-owners of a motor vehicle repair shop, stole a 1977 blue and black Chevrolet Blazer from the Buggy Bath Car Wash which was located a few blocks from the accused's repair shop. After stealing the Blazer, they allegedly stripped it of its more valuable parts and abandoned the damaged Blazer carcass in a remote area near the edge of town. The Blazer was reported stolen on January 12, 1989, and was found by the police two days later. Law enforcement authorities questioned Gentry and Lariviere on January 18 about the Blazer. Gentry consented to a search of his repair shop and seizure there of numerous parts from the Blazer. Gentry's theory of defense was that he and his business associate had obtained the Blazer through a customer's work order that had been telephoned to his business associate. He claimed he was innocent of any wrongdoing and that the stripping of the Blazer at their shop was done at the telephone request of the unidentified customer.

One of the state's witnesses, officer Lipka, testified about an oral confession made by Gentry when questioned on January 18. Gentry denied he made any confession to Officer Lipka. Other facts as they are relevant to our disposition of the appeal will be set forth as necessary.

Before trial, the trial court denied Gentry's motion in limine to exclude from trial any testimony about Gentry's six-year old felony conviction for manslaughter. After the state rested following its case-in-chief, the prosecutor told the court that if Gentry testified on his own behalf, the state would not only impeach him with the manslaughter conviction but also with a misdemeanor check fraud conviction.

Gentry testified on his own behalf. On direct examination his counsel asked him whether he had ever been convicted of a felony. The prosecutor objected, stating "this is not the time to do that." At the sidebar conference the court told Gentry's counsel that Gentry's prior convictions had no relevance except by way of impeachment. In reply, Gentry's counsel explained, "I think that we should be able to bring it out to make it clear to the jury we're not trying to hide it." The court sustained the objection saying, "That's an improper question at this time."

On cross-examination the prosecutor asked Gentry about his prior felony conviction, to which Gentry's counsel objected on relevancy grounds. Later, the prosecutor asked Gentry about his check fraud conviction, to which Gentry's counsel objected on grounds of relevancy. The court overruled both objections.

In closing argument, the prosecutor emphasized that the jury had to decide whether the witnesses had told the truth. Directing the jury's attention to Gentry, the prosecutor said,

[a]ll you saw was the defendant. This defendant, with the check fraud convictions. This defendant, with felony convictions—conviction on his record. This defendant * * * who doesn't want to be convicted. This defendant, who will do anything to try to fool you.

Those things fit the considerations of credibility * * *.

\* \* \* \* \* \*

And, finally, whether the facts related are inherently believable * * *.

Defense counsel in his closing argument matched the prosecutor's theme by telling the jury, "We end up with two men telling completely different stories."

According to Gentry, the jury's reaction to his credibility was the single most important factor in the trial. Since his credibility played such a crucial role, he claims that

the court's erroneous evidentiary ruling made it appear he was trying to hide his prior convictions and that false appearance unfairly tipped the scale against his credibility in the eyes of the jurors. Had he been allowed to testify first about his checkered past, Gentry asserts, it is reasonably possible the verdict might have been more favorable for him.

## DISCUSSION

### Standard of Review

■ Generally speaking, an evidentiary ruling is within the sound discretion of the trial court, and we will not find error unless the court abused its discretion. *Velos v. State*, 752 P.2d 411, 414 (Wyo.1988). We continue to say that, "[j]udicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." *Martin v. State*, 720 P.2d 894, 897 (Wyo.1986).

### W.R.E. 609(a)

The state contends that the trial court's ruling was correct since our rule establishes on its face that a witness's prior convictions may be raised only on cross-examination. That rule provides:

(a) *General rule.*—For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one (1) year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

W.R.E. 609(a).

We do not read the rule as narrowly as does the state. As we read the rule, it does not say that the proponent of a witness may not elicit on direct examination the fact of the witness's prior convictions. In the context of a charge of ineffective assistance of counsel, this court has commented: "It was also a legitimate tactic to have his client voluntarily discuss his prior convictions before they were raised by the prosecution in cross-examination." *Robinson v. State*, 716 P.2d 364, 368 (Wyo.1986). Authors Louisell and Mueller tell us, "When the proponent of a witness anticipates that his adversary will raise the fact of prior convictions upon cross-examination, it should be proper for the proponent to blunt the impact of such impeachment by bringing out the pertinent facts upon direct examination." 3 D. Louisell & C. Mueller, *Federal Evidence* § 319, p. 347 (1979).

A look at federal authority is helpful since W.R.E. 609(a) is identical to F.R.E. 609(a). *See Jones v. State*, 735 P.2d 699, 701 (Wyo.1987). In *United States v. Hasenstab*, 575 F.2d 1035, 1040 (2d Cir.1978), *cert. denied*, 439 U.S. 827, 99 S.Ct. 100, 58 L.Ed.2d 120 (1978), the court approved the government's practice of eliciting from its chief witness on direct examination testimony about that witness's prior convictions. The court noted that had the government not done so, the jury might think that the government had something to hide. *See also, United States v. Bynum*, 566 F.2d 914, 923 (5th Cir.), *cert. denied*, 439 U.S. 840, 99 S.Ct. 129, 58 L.Ed.2d 138 (1978); *United States v. Apuzzo*, 555 F.2d 306, 307 (2d Cir.1977), *cert. denied*, 435 U.S. 916, 98 S.Ct. 1470, 55 L.Ed.2d 507 (1978); *United States v. Hawley*, 554 F.2d 50, 52 (2d Cir.1977) (after trial court denied motion in limine, defense counsel brought up the subject of prior convictions on direct examination); and *United States v. Nelson*, 529 F.2d 40, 42 (8th Cir.), *cert. denied*, 426 U.S. 922, 96 S.Ct. 2631, 49 L.Ed.2d 377 (1976), (after trial court denied defense motion in limine to suppress prior convictions, defense counsel elicited testimony about them on defendant's direct examination). In *United States v. Dixon*, 547 F.2d 1079, 1082 n. 2 (9th Cir.1976), the court said, "It seems clear from the legislative history that on

direct examination, a party may elicit the evidence of a prior conviction from his own witness * * *."

Use of testimony about the existence of prior convictions, in order to blunt the opponent's impeachment cross-examination on that subject, is to be distinguished from the improper practice of a proponent's eliciting evidence of the *absence* of prior convictions from his or her own witness. *See, e.g., United States v. Hicks*, 748 F.2d 854, 859 (4th Cir.1984). This latter "tactic amounts to supporting a witness before he has been attacked, and it is forbidden by Rule 608(a)." 3 Louisell & Mueller, *supra*, at 206 (1989 Supp.).

▪ We hold that a proponent may elicit on direct examination evidence of the existence, but not the absence, of his or her own witness's prior convictions. Applying that view to the trial court's ruling on Gentry's direct examination about his prior convictions, we hold that the trial court erred in sustaining the prosecutor's objection.

The state claims, however, that this erroneous evidentiary ruling was harmless error. W.R.Cr.P. 49(a) provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." *See also* W.R.A.P. 7.04. We turn now to this court's harmless error jurisprudence to determine whether the trial court's erroneous evidentiary ruling affected substantial rights to which Gentry was entitled.

*Constitutional Error*

▪ Gentry asserts that the erroneous evidentiary ruling is of constitutional magnitude since it precluded him from testifying on direct examination about his prior convictions thereby impinging on his right to have the jury fairly judge his credibility. Positing that credibility determinations are an essential element of the right to a jury trial, Gentry seeks to anchor his assertion of constitutional error to the right of trial by jury found in the sixth amendment to the United States Constitution and Wyo. Const. art. 1, § 9. In the case of constitutional error, Gentry observes, the burden is on the state to show that the error is

harmless beyond a reasonable doubt. *Hyde v. State*, 769 P.2d 376, 381 (Wyo. 1989); *Maupin v. State*, 694 P.2d 720, 723 (Wyo.1985); *Krucheck v. State*, 671 P.2d 1222, 1225 (Wyo.1983); *Ortega v. State*, 669 P.2d 935, 943 (Wyo.1983); *Campbell v. State*, 589 P.2d 358, 366, 368 (Wyo.1979).

In response to Gentry's assertions, the state counters that an erroneous ruling under W.R.E. 609(a) does not reach constitutional dimension, *Vaupel v. State*, 708 P.2d 1248, 1250 (Wyo.1985), and that Gentry, as appellant, has the burden of establishing the prejudicial or injurious nature of the error. *Jones*, 735 P.2d at 702–03; and *Spilman v. State*, 633 P.2d 183, 185 (Wyo. 1981).

*Vaupel* is not helpful because this court was treating whether a ruling in limine under W.R.E. 609(a) reaches constitutional dimensions. The issue here goes beyond a ruling in limine; the trial court's ruling prevented Gentry from presenting prior conviction evidence in his case-in-chief. In *Campbell* this court adopted for constitutional questions the rule of *Chapman v. State of California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710–11, 24 A.L.R.3d 1065 (1967): before a federal or state constitutional error can be held harmless, the burden is on the state to demonstrate and the court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Campbell*, 589 P.2d at 367, 368. In that case this court referenced the few constitutional violations that can never be classified as harmless error: coerced confession, right to counsel, and impartial judge. *Id.*, 589 P.2d at 367 n. 6. In *Ortega* this court identified as constitutional error the erroneous admission of improperly seized evidence in violation of the fourth amendment of the United States Constitution, but found it to be harmless beyond a reasonable doubt under the totality of all the evidence. In *Krucheck* this court held an erroneous jury instruction, which failed to inform the jury that the existence of malice as an element of the offense of second degree murder must be proven beyond a reasonable doubt, was constitutional error in light of the require-

ment of the fourteenth amendment, United States Constitution, that the state must prove every element of a criminal offense beyond a reasonable doubt. In *Maupin* this court identified the trial court's erroneous ruling, that the trial proceedings could continue despite the accused's involuntary health condition-caused absence, as constitutional error in light of the accused's right under the sixth amendment, U.S. Const. amend. VI and Wyo. Const. art. 1, § 10 to be present during every stage of his or her trial.

▮ We conclude that the trial court's erroneous ruling precluding Gentry's direct examination testimony about his prior convictions reached constitutional magnitude. U.S. Const. amend. VI; and Wyo. Const. art. 1, § 10. Because the ruling infringed on Gentry's right to defend himself and present evidence in his own behalf, it is constitutional error.

*Effect of Constitutional Error*

We turn now to determine whether that constitutional error requires reversal or was harmless beyond a reasonable doubt under the totality of all the evidence. Gentry urges us to keep our focus in the narrow context that the case boils down to "two men telling completely different stories." With that narrow focus, Gentry claims, the jury reaction to Gentry's credibility is the single most important factor in the trial. Thus, Gentry sees the case as whether the jury believed officer Lipka, who testified that Gentry confessed to him, or Gentry, who testified that he never confessed to officer Lipka.

We have examined this constitutional error in the context of the entire record, *Jones*, 735 P.2d at 703, including the complete trial transcript; we did not simply compare officer Lipka's testimony with Gentry's, but examined each witness's testimony in light of the testimony of the other witnesses. The following is the court's instruction to the jury as to its role in the determination of witness credibility:

You will decide which witnesses you believe and how much weight you give their testimony. In deciding what you believe, you may consider anything about a witness which tends to prove or disprove truthfulness, including the following:

1. His conduct, attitude, and manner while testifying;

2. His physical and mental capacity to have heard or seen that about which he testifies;

3. His ability to remember and to tell here in court what he has heard or seen;

4. His reputation for honesty and truthfulness or for dishonesty and untruthfulness;

5. Whether he has a bias or prejudice, an interest in the outcome of the trial, or any other motive for not telling the truth; and

6. Whether the facts he related are inherently believable or unbelievable.

In evaluating witness credibility other facts are also important.

1. You should consider statements by a witness that are either consistent or inconsistent with testimony given in court.

2. If a witness admits to untruthfulness at some other time, you may consider that admission but you should take into account all the circumstances surrounding it; for instance, whether it was a sworn statement, whether it was made under pressure, whether it was self-serving and whether it was an important or merely a minor misstatement.

3. If you conclude that a witness has willfully lied under oath about any material fact in this case you may distrust all of his testimony. On the other hand, if you think it is reliable, considering all the other evidence, you may still believe it. Differences between one witnesses' testimony and that of others, does not necessarily mean someone is untruthful. Two persons who witness an incident may see or hear it differently. In resolving differences in testimony, you should consider all the circumstances of the case whether the discrepancy concerns an important fact or a trivial one.

You should not decide a fact based on the number of witnesses who testify

about it. The testimony of one witness you believe, considering all the circumstances of the case, is sufficient to prove any point.

In other words, a witness's credibility is a quilt of many patches: demeanor, forthrightness, apparent motives, internal consistency of testimony, external consistency of testimony when compared to other witnesses' testimony, and plausibility of the witness's testimony in relation to the jury's combined life experiences. No one of these patches is a talisman for the jury; instead, it is in their interrelationship as perceived in the collective mind of the jurors that they have significance and effect. Probably, the whole is larger than the individual parts.

### The Evidence

Gentry's credibility was damaged by several telling pieces of evidence. A more detailed review of the facts bearing on credibility may help place Gentry's claim of error in perspective. We are mindful that the trial court had properly instructed the jury that if it concluded that a witness has willfully lied under oath about any material fact in this case, it could distrust all of that witness's testimony. Apart from officer Lipka's claim and Gentry's denial of confession, strong evidence of Gentry's guilt existed. There was no dispute that Gentry went to get the Blazer, towed it to his repair shop, stripped it of its valuable parts, voluntarily showed those parts to law enforcement authorities and first consented to their seizure. The dispute centered on whether he stole the Blazer in the first place or, as Gentry claimed, he was innocently involved in someone else's theft of it.

Gentry testified that when he and his business associate Lariviere first went to work on the Blazer on January 12 at a location where the alleged customer had left it because it would not start, Lariviere handed him the key to the ignition and he (Gentry) tried unsuccessfully to start the engine. Gentry further testified that the Blazer key was at his repair shop along with the Blazer as they worked on it on January 12 and 13. In sharp contrast, the state presented two witnesses, the manager of the Buggy Bath Car Wash and the owner of that firm who also was the Blazer's owner, who testified they had possession of the only sets of keys to the Blazer at all times. Since these men had possession of the Blazer's keys both before and after the Blazer was stolen, the jury no doubt did not believe Gentry's testimony that he had a key for the Blazer.

Gentry called game warden William F. Burton to testify about Burton's questioning of Gentry which occurred shortly before officer Lipka questioned him. Burton testified that when he asked Gentry about a possible vehicle that might be in his shop, Gentry denied knowing anything about the vehicle and would not talk to Burton about it. In contrast, Gentry's trial testimony was the Blazer had been in his repair shop. The jury reasonably could have believed Burton's testimony and drawn the inference that initially Gentry was trying to deny knowledge about the Blazer.

■ The jury also heard testimony from both Gentry and his wife that on January 14, the day on which the police found the stolen Blazer, Gentry and his wife drove to California, allegedly to visit her father who had allegedly suffered a heart attack. Their testimony had Gentry returning to Gillette without his wife on January 17, but not returning to his repair shop where he was the sole mechanic and where three customers' motor vehicles awaited his work. Instead, Gentry and Lariviere sighted in a rifle on January 18, and Gentry left for California again on January 20 to get his wife. Their testimony then had them both returning to Gillette late in the evening of January 22 or early in the morning of January 23; then, Gentry in just "a few hours" left again for California allegedly to "keep an eye on his wife's parents" and do some remodeling work on a friend's apartment complex. Moreover, despite Mrs. Gentry's testimony to the contrary, officer Lipka testified that she told him on January 23 that when Gentry arrived in California, before she returned to Gillette, he met with her for an hour, gave her custody of

their children, told her he was in trouble and would be leaving. Gentry was arrested in Washington several months after leaving Gillette. In light of Gentry's testimony that he wanted to make a go of his Gillette repair shop, the jury reasonably could have concluded that he left Gillette to avoid arrest in connection with the stolen Blazer. Flight is evidence of guilt. *Smizer v. State*, 752 P.2d 406, 411 (1988).

Having carefully examined the error in the context of the entire record, we conclude that it did not adversely affect the jury's verdict. The error related to which party would present the prior conviction evidence, not to whether that evidence was admissible. Gentry concedes that the prior conviction evidence had sting—it would hurt him. He claims that deprivation of his right to present that harmful evidence first rendered his trial unfair. We disagree. There was strong evidence of Gentry's guilt, which evidence fatally implicated his credibility. We note that the prosecution in closing argument did not comment about which party presented the prior conviction evidence. There was no argument that Gentry had tried to hide that evidence but that the prosecution had brought it forward in its search for the complete truth.

In this instance, we are unable to find that the trial court's failure to let the accused present the prior conviction evidence in his case-in-chief was such an error that in its absence there would be any reasonable possibility of a verdict more favorable to Gentry. It is clear that he was convicted because the jury believed the prosecution's witnesses and did not accept Gentry's explanation of innocent involvement. We presume the jury read and followed the instructions and, in particular, determined witness credibility in light of all of the facts that relate to it as properly explained in those instructions.

We conclude that although the trial court erred in not permitting the accused to present prior conviction evidence in his case-in-chief, that error was harmless beyond a reasonable doubt.

Affirmed.

URBIGKIT, Chief Justice, dissenting.

The dialectic of harmless error after improper rulings on admission or rejection of evidence frequently results in the appellate court converting itself into a superannointed fact finder. This is such a case. Since I do not grant myself the mystical capacity to empirically and accurately assess jury decisional processes, I dissent. In this case, we jump from the ship of reason to embark upon subjective conjecture in a bottomless boat by finite decision to apply a harmless error incrustation on justice creating a significant and harmful limitation of the accused's right to defend.

When we affirm a criminal conviction, we necessarily affirm the *means* used by government to secure that conviction as the means by which *any one of us* may be deprived of life, liberty, or property. The ends do not justify the means; nor can the result justify the process. Repeated incantations about society providing no guarantees of perfection supply no justification for the result oriented disregard of significant trial error.

Harmless error is often a legal fiction. A declaration of harmless error does not mean the error was harmless, it means a reviewing court is not so concerned with the error that it will give relief to the defendant. In this case, Gentry's right, which is recognized by the majority, appears to have been violated by a corrosive and unjustified trial process. Under circumstances of this nature, we need to do more than just protect constitutional rights—we need to protect the integrity of our criminal conviction system.

Although *proper* impeachment and testing of the credibility of any witness is justified in cross-examination, what occurred here is the denial of an adequate opportunity to defend. The point of my departure begins when the majority ends in analysis after "weighing" the evidence to decide that Gentry would have been found guilty even if he had been accorded our full range of constitutional guarantees. The majority's focus is on what they assume the result would have been after considering the weight of the untainted evidence—

their focus was not upon the error itself. There is more to a harmless error analysis than is provided here.[1] Wyoming's rules of evidence and procedure also constitute a central part of our design to guarantee a fair trial.

Two kinds of error may occur during a trial: those caused by the violation of a right protected by the federal Constitution [and state Constitution], and those resulting from an infraction of a state or federal evidentiary rule. Although the Constitution may commonly be considered the source of fair judicial procedure, the nonconstitutional evidentiary rules may actually be a defendant's primary protection. A state does not design its evidentiary rules in a vacuum; each rule is intended to play a part in guaranteeing a fair trial—by excluding unreliable evidence, by balancing the probative value of certain kinds of evidence against the prejudicial effect, by barring extraneous matter, by guiding the jury or judge in proper performance of the decision-making function. Each rule signifies a state policy with respect to fairness, a policy that is applicable in all cases irrespective of the charge and the identity of the defendant.

Saltzburg, *The Harm of Harmless Error*, 59 Va.L.Rev. 988, 989 (1973) (footnote omitted). *See also* Field, *Assessing the Harmlessness of Federal Constitutional Error—A Process in Need of a Rationale*, 125 U.Pa.L.Rev. 15 (1976). Saltzburg, *supra*, 59 Va.L.Rev. at 1032 (footnote omitted), cautions us to keep in mind "that the very essence of the American criminal law is proof beyond a reasonable doubt and that this evidentiary standard should be sustained, not undermined, by the harmless error test used on appeal."

We should recognize that this holding invades the basic tenant of constitutional criminal law that requires a fair hearing and that the determination of guilt is to be based on the facts behind the charge. We invade that tenant by what has become our wholesale use by prosecutors of prior felony convictions. We long ago accommodated that invasion under our rules of evidence, W.R.E. 609.[2] Now we accommodate even more by forgiving the prosecutor and the trial judge, after looking to the untainted evidence instead of the error, under W.R.Cr.P. 49(a), our harmless error rule. There comes a time when we are called to question the corrosive effects of our wholesale accommodations of guilt by association and reputation processes on constitutional protections to protect people from governmental tyranny. Like the destruction of our rain forests, we may not realize now what we have lost for tomorrow.

Few jurisdictions recently have struggled harder to understand "harmless error" than the Texas Court of Criminal Appeals. Adoption in Texas of a "harmless error rule," Texas Rules of Appellate Procedure 81(b)(2), did not diminish the intensity of that struggle. After an exhaustive evaluation of state and United States Supreme Court precepts, the Texas Court of Criminal Appeals said:

In summary, a reviewing court in applying the harmless error rule should not focus upon the propriety of the outcome of the trial. Instead, an appellate court should be concerned with the integrity of the process leading to the conviction. Consequently, the court should examine the source of the error, the nature of the error, whether or to what extent it was emphasized by the State, and its probable collateral implications. Further, the court should consider how much weight a juror would probably place upon the error. In addition, the Court must also determine whether declaring the error harmless would encourage the State to repeat it with impunity. * * * Consequently, the reviewing court must focus upon the process and not on the result.

*Harris v. State*, 790 S.W.2d 568, 587–88 (Tex.Cr.App.1989). *See Arnold v. State*, 786 S.W.2d 295 (Tex.Cr.App.), *cert. denied* — U.S. ——, 111 S.Ct. 110, 112 L.Ed.2d 80

---

**1.** The Wyoming harmless error rule, W.R.Cr.P. 49, is the same as its federal counterpart, F.R. Cr.P. 52.

**2.** F.R.E. 609(a) was amended effective December 1, 1990.

(1990). *Cf. Derrick v. State,* 773 S.W.2d 271 (Tex.Cr.App.), *cert. denied* —— U.S. ——, 110 S.Ct. 209, 107 L.Ed.2d 162 (1989).

After synthesizing *Harris* and Texas Rules of Appellate Procedure 81(b)(2), the author of Comment, *"To Err Is Human"— But Is It Harmless?: Texas Rules of Appellate Procedure Rule 81(b)(2) and the Court of Criminal Appeals' Effort to Fashion a Workable Standard of Review,* 21 Tex.Tech.L.Rev. 2205, 2220–24 (1990) (quoting *Harris,* 790 S.W.2d at 587, footnotes omitted and emphasis in original) indicated:

> The Court of Criminal Appeals, realizing that the harmless error rule is inherently subjective, stated that the most it could do was to "set out general considerations which may be relevant, and trust individual judges to use these observations in their personal calculus." The court looked at the most basic of considerations in formulating its guidelines: the fairness and integrity of the criminal trial process. The following are the factors which the court reasoned are to be considered in making a correct harmless error analysis:
> 1) the source and nature of the error;
> 2) the extent to which the State used the error throughout the course of the trial;
> 3) the probable collateral implications of the error;
> 4) the probable weight a juror could put on such an error; and,
> 5) the likelihood that a finding of harmlessness would encourage the State to repeat the error.
> In prescribing the above considerations, the court sought to shift the focus to the *process* rather than the *result.*

   *    *    *    *    *    *

Rule 81(b)(2) of the Texas Rules of Appellate Procedure is designed to insure a fair criminal trial without the need for reversal due to technical, insignificant errors. No criminal trial is error free. Although it is impossible to set out a "bright line" rule for making a harmless error determination, the Court of Criminal Appeals has enumerated several factors to be considered. By using this framework and holding the State to its burden of showing harm beyond a reasonable doubt, the analysis will be focused on the error and not the untainted evidence.

The majority's holding for Gentry addresses the reasonable double component of *Chapman v. State of California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, *reh'g denied* 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967) by first weighing the untainted evidence and then predicting the composite reaction of the jury. This reach into the psyche of the jury usurps the function of the jury in a fashion contrary to Wyo. Const. art. 1, § 9. Other than our use of harmless error as a legal fiction, how can we declare so confidently that denying the defense attorney the right to ask his client about his prior problems with the law and giving that right only to the prosecutor could not have contaminated the determination of guilt beyond a reasonable doubt?

> What is so often apparent in the opinions of appellate court judges is that the harmfulness of an "error" can only be gauged by the personal reaction of an individual to it. The appellate court judge must imagine that he stands in place of a juror and, taking the record of the trial as a whole, must faithfully ask himself whether he would convict had the "error" not been committed. If he pretends, as a way of speaking, that the question concerns not himself but the foreman of an actual jury, or even twelve jurors collectively, no one is fooled into thinking that he really knows how a particular juror or group of jurors were affected by the "error." We know that he speaks for himself and that, in saying the juror or jurors would not have reached a different decision, he means that they would have reach the same decision he reached. He cannot quantify the probable trust of his conclusion, nor can he even elaborate his reasons for it. He can say why the "error" would not have affected his own decision, or why it would have made no contribution to his

own verdict, * * * but he cannot say why he believes it would not have affected the decision of others. Anyone who cares to undertake an inquiry will likely find that no written opinion of any appellate tribunal has ever given a satisfactory basis for concluding that jurors would have returned the same verdict regardless of legal error in the case.

I am generally opposed to the so-called "harmless error rule" for this very reason. In our system of justice, fairness and impartiality are produced, if at all, by operation of legal rules and by the assignment of adjudicatory responsibilities. Those who fashion these rules, including the legislative and judicial branches of government, may be expected to consider the efficacy of what they produce and to decide what rules and standards are necessary to achieve fairness in the system as a whole. When a procedural or evidentiary rule seems not to work well, or when it seems to produce unjust results, the remedy is to amend or repeal it. The harmless error rule does neither. It leaves the law fully intact, but authorizes appellate court judges to pardon the violation of any legal precept, constrained only by their personal views of fairness and justice. This is not the sort of method Texans have a right to expect in a government of laws.

I do not mean to suggest that appellate court judges are less qualified than jurors to decide ultimate issues of guilt and innocence. But in our system of criminal justice, such decisions are not a part of their adjudicatory responsibilities, and it is an outrageous travesty to confer such authority upon them by subterfuge. The harmless error rule, particularly when created by judicial review, represents a seizure by the bench of veto power inconsistent with its proper role in government.

**3.** Harmless error as it is used in this decision is no standard—just result oriented—individual case factual resolution. This is strikingly similar to the "shock to the judicial conscience"

*Derrick,* 773 S.W.2d at 277-78 (footnotes omitted), Clinton, Teague and Duncan, Justices, dissenting.[3]

Added to harmless error as an initial prognosis for the initiating illness, this case in basic aspect effectively portrays why the impeachment by felony conviction has a high invalidity constituent in the reach for ascertainment of guilt and renders unfair the operation of a justice delivery system. McGowan, *Impeachment of Criminal Defendants by Prior Convictions,* 1970 Law and Social Order 1 (1970); Note, *Green v. Bock Laundry—Rule 609(a)(1) in Civil Cases: The Supreme Court Takes an Imbalanced Approach,* 1990 Utah L.Rev. 613 (1990). This is true as the scholars now recognize for three reasons. First, conviction of many types of felonies has little or nothing to do with the likelihood of veracity in testimony. Secondly, conviction by prior experience and reputation is a narcotic addictive increasingly significant in criminal trials for prosecutors to obtain a favorable jury decision. Third, and most significant in empirical analysis of crime and punishment, is that lack of luck and conviction are correlative factors and, for every person convicted, perhaps ten others could have been and should have been but, for variant reasons of fortune and circumstance, were saved the fate of the disadvantaged. Those that should have been convicted and were not are certainly no more reliable as witnesses than those that should have been and were convicted. Liars in generic grouping cannot be confined to persons with a felony conviction. *Miller v. State,* 784 P.2d 209, 215 (Wyo.1989), Urbigkit, Justice, dissenting; Beavers and Marques, *A Proposal to Modify the Rule on Criminal Conviction Impeachment,* 58 Temp. L.Q. 585, 620 (1985).

Since we initiate consideration of this case by the basic problems of impeachment by felony conviction, which generically often represents conviction by reputation, McGowan, *supra,* 1970 Law and Social Order at 15, we are then further required to

concept recently addressed by this court in damage award review in *Coulthard v. Cossairt,* 803 P.2d 86, 92 (Wyo.1990) (Urbigkit, C.J., specially concurring).

address when opportunity for amelioration of the inevitable harm is denied to the defendant by improper objection and an incorrect trial court decision. We accept unadulterated greed and the unconfined immorality in this society while the "convict," as a principle of weighing testimony, stands alone to be generically questioned about his testimony.

In first concept, I do not agree that any harmless error concept within this case involves only a constitutional deprivation question. Neither our rule nor general law requires a harmful error to which objection is taken to be constitutional for amelioration. Our rule, W.R.Cr.P. 49, addresses absence of a substantial right for disregard and not a constitutional deprivation. Plain error extrudes more closely on constitutional mistake. For this case, I need not look for the constitutional deprivation to recognize that a reversible error was created.

However, the platform provided in the majority analysis is constitutional. Obviously, if error is substantial in assessment of due process, it may also be a constitutional deprivation. I would find that the mistake in this case was constitutional in scope and I can then agree under the circumstances that the test of harmless beyond a reasonable doubt is an absolute requirement for the conviction to be affirmed. *Maupin v. State*, 694 P.2d 720 (Wyo.1985); *Campbell v. State*, 589 P.2d 358 (Wyo.1979). The decision of the case, however, addresses reasonable doubt as an appellate weighing process when applied to the composite reaction of the jury. What really occurs in the thinking process of the appellate jurist is converted into an evidentiary analysis to achieve satisfaction about guilt. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U.Chi.L.Rev. 142 (1970).

I reject this process for two complimentary reasons. The first is an intrinsic assumption of a greater fact finding validity capacity of the jurist than expected from the composite layman juror. The second is constitutional. The basic constitutional law, both federal and state, clearly defines that it is to be a jury who determines guilt

and not the cloistered jurist who never sees the witnesses nor observes the panorama of the trial proceeding. The Wyoming Constitution should confine our excursions. Wyo. Const. art. 1, § 9 says "[t]he right of trial by jury shall remain inviolate * * *." *See Hyatt Bros., Inc. ex rel. Hyatt v. Hyatt*, 769 P.2d 329 (Wyo.1989).

The central issue presented by Gentry is that the process used to convict him deprived him of the right possessed by each of us to have a jury determine credibility of ourselves or our witnesses. By denying him the right to demonstrate his credibility by admitting his status as a felon before the prosecutor tried to make his felony status an irrebuttable presumption of an inability to tell the truth, the trial court deprived him of a right to which he was entitled. I agree with Gentry's analysis:

In the case at bar, however, the trial court's erroneous ruling on the crucial matter of credibility deprived Mr. Gentry of his constitutional right to have such matters determined by the jury. The Sixth Amendment to the United States Constitution guarantees to an accused in criminal prosecutions "the right to a speedy and public trial, by an impartial jury * * *." Article 1, Section 9 of the Wyoming Constitution provides that "The right of trial by jury shall remain inviolate in criminal cases." It has long been recognized that the right to a jury trial is the right to all the essential elements of a jury trial. *Patton v. United States*, 281 U.S. 276, 288, 50 S.Ct. 253, 254, 74 L.Ed. 854 (1930); *Lapp v. City of Worland*, 612 P.2d 868, 973 (Wyo. 1980.)

It is informative to recognize that Gentry and the majority get to the same point where the determination remaining is the burden of the State to show the error was harmless beyond a reasonable doubt. Gentry properly cites:

Where federal or Wyoming constitutional error is made out, the burden is on the state to show that the error is harmless beyond a reasonable doubt. *Campbell v. State*, 589 P.2d 358, 366, 368 (Wyo.1979); *Ortega v. State*, 669 P.2d

935, 943 (Wyo.1983); *Krucheck v. State,* 671 P.2d 1222, 1225 (Wyo.1983); *Maupin v. State,* 694 P.2d 720, 723 (Wyo.1985).

Gentry then reasons:

In the case at bar, harmless error beyond a reasonable doubt cannot be made out because there is no way to know how the jury might have resolved the crucial question of credibility had Mr. Gentry not been prevented from being forthcoming about his prior convictions on direct examination by the trial court's erroneous ruling.

To the contrary, this majority reaches into the psyche of each juror to conclude, in the interest of affirming conviction, that it would not have made any difference had Gentry been given a fair chance. I reject this approach because it does not address the effect of the error on the jury. "To err" may be human, Comment, *supra,* 21 Tex.Tech.L.Rev. 2205, but to look at the result rather than the process is unjustified and wrong.

I would further note that the felony conviction credibility examination is severely subject to question in both scope of questions and process of introduction. This examination was particularly harmful because Gentry had been denied earlier opportunity to posit the facts himself. I question whether anyone who ever wrote an insufficient funds check comes within the criteria of W.R.E. 609(a)(2). If so, there are a lot of us who are vulnerable to W.R.E. 609. Some of us may even be prosecutors. Mathematical error in a check register or counting deposits which have not cleared is no test for deciding who is a perjurer. The second event was particularly harmful in practical fact since, at the time of the conviction, Gentry was in jail waiting trial on the present charge and had no realistic opportunity to cover the check or defend the proceeding.

We should recognize how these issues flowered at trial to properly analyze whether the conviction should be affirmed. The subject was first addressed in an in limine examination prior to trial:

[DEFENSE COUNSEL]: Your Honor, I would ask that—the way I understand it, what usually opens the door for this to come in is the prosecutor asked my client whether or not he has a criminal record, and if my client denies it, then it can come in.

THE COURT: Well, not a criminal record. He needs to ask him if he has a felony conviction. If he has a criminal record, that would be inappropriate.

[DEFENSE COUNSEL]: But if he says yes, I have a felony conviction, the actual crime cannot come in?

THE COURT: That's correct. If he says have you ever been convicted of a felony, and he admits it.

[DEFENSE COUNSEL]: That should be the end of it.

THE COURT: That is the end of it. That's correct.

[DEFENSE COUNSEL]: Okay.

\*       \*       \*       \*       \*       \*

[PROSECUTING ATTORNEY]: Your Honor, before the defense starts it's [sic] case, I don't know if [defense counsel] still plans on calling Mr. Gentry—there was the subject of the previous convictions that would be available to be impeached for—impeach the defendant with.

THE COURT: Well, of course, the rule is # 609, I believe—

[PROSECUTING ATTORNEY]: Yes.

THE COURT: —of the Rules of Evidence, which provides that if it has probative value, and that outweighs its prejudicial effect.

The court believes that it would have a great deal of probative value, and I would, as I said yesterday morning, allow you to ask whether he had a felony conviction.

[PROSECUTING ATTORNEY]: All right, Your Honor.

The reason I brought it up is I believe there was an exchange between—sort of tag end of that issue—regarding the fact that I wouldn't be able to establish what, what the offense was, simply that it was a felony offense.

Maybe I misunderstood what the court was saying.

THE COURT: I'm not going to tell anyone how to try the case.

I believe, however, the appropriate question would be is it correct that you were convicted of whatever it was, and that would be—if the answer is yes, that would be the end of the questioning.

[PROSECUTING ATTORNEY]: All right.

With these rulings made, the subject was then initiated by defense counsel in direct examination:

Q. Now, I want to turn to another subject, Mr. [Gentry], and I know it's going to be a hard subject for you.

Can you tell me whether or not you've ever been convicted of a felony?

[PROSECUTING ATTORNEY]: Objection, Your Honor, this is not the time to do that.

THE COURT: Can I have counsel up here.

(The following proceedings were had at the bench, outside the hearing of the jury.)

THE COURT: That subject has no relevancy except by way of impeachment, unless you can tell the court what that would be at this time, and unless you want to impeach your own witness.

[DEFENSE COUNSEL]: Well, Your Honor, it's obvious that the state's—it's obvious that the state is going to bring this out.

I think that we should be able to bring it out to make it clear to the jury we're not trying to hide it, we're willing to live with the fact that he has this problem.

And—

THE COURT: That's an improper question at this time.

The golden opportunity was left for cross-examination by the prosecutor. He wasted no time in avid pursuit:

Q. You are the defendant in this case, Michael Allen Gentry?

A. Yes, I am.

Q. And Mr. Gentry, it's not particularly pleasant to be a defendant; is it?

A. No.

Q. That's because you know you might be convicted of this offense?

A. Hope not.

Q. But you know you might be; true?

A. Possibility.

Q. You don't want to be convicted of this offense?

[DEFENSE COUNSEL]: Objection, Your Honor; irrelevant.

THE COURT: Sustained.

Q. (By [prosecuting attorney]) This is especially true because you have a prior felony conviction?

[DEFENSE COUNSEL] Objection, Your Honor; irrelevant.

THE COURT: Overruled.

Q. (By [prosecuting attorney]) Is that right?

A. Could you repeat that?

Q. This is especially true because you have a prior felony conviction; true?

A. Yes, I do.

Q. That is a conviction for voluntary manslaughter?

A. Manslaughter.

Q. That was on October 15th of 1982 in California?

A. That sounds approximately right.[4]

Examination then continued for about fifteen more pages in the record regarding general events when the next prosecutorial missile was launched, after an examination about money which was left with the business when Gentry had gone to California:

Mr. Gentry, isn't it true that you were recently convicted of a check fraud offense?

[DEFENSE COUNSEL]: Objection, Your Honor; irrelevant.

THE COURT: Overruled.

A. (By Mr. Gentry) I had—

Q. Excuse me.

That is true; true—correct?

A. Yes.

---

**4.** The manslaughter offense within its related facts had absolutely no relation to whether Gentry would or would not testify truthfully. This was absolute prosecution by bad reputation and innuendo with which the trial judge fully cooperated.

Q. Mr. Gentry, that conviction occurred on August 1st of '89? Does that sound about right?

A. I believe that's the date, yeah.

Q. Those checks that are the—or the check that you were convicted, the check fraud conviction was based on, that was drawn on the Auto Medics' account; wasn't it?

[DEFENSE COUNSEL]: Objection, Your Honor; irrelevant. They're going into a charge that has to do to do [sic] with anything in this case.

[PROSECUTING ATTORNEY]: Your Honor, goes under like facts, the offense —conviction, what he's testified to.

THE COURT: Overruled.

A. (By Mr. Gentry) The reason for the charge—

Q. Excuse me.

The check that caused your conviction for check fraud was written on the Auto Medics' account; true?

A. For insufficient funds.

Q. And, in fact, that check was written on January 19th, of 1989; true?

A. I believe those were the dates, yeah.

Q. In fact, your account had been in overdraft for a few days even prior to that; true?

A. Because the deposit wasn't made on Friday like it was supposed to be. Had Lariviere deposited it like he was supposed to, it would not have happened.

Q. Excuse me.

I didn't ask you any questions.

How, in a credibility tested case, all of this could be harmless beyond a reasonable doubt is, beyond any doubt in my mind, unsustainable by principle or logic. *See* Moss, *Bias by Innuendo*, A.B.A.J., at 19 (Aug.1990).

Consequently, I dissent.